# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

====================
## NO. 03-05-00533-CV
====================

**Clifford Zeifman, Appellant**

**v.**

**Sheryl Diane Michels, Appellee**

=================================================================
### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
### NO. 97-09369, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING
=================================================================

## O P I N I O N

Clifford Zeifman appeals the trial court's modification order of a divorce decree giving appellee Sheryl Diane Michels the exclusive right to make decisions concerning their daughter's education. In two issues, he complains that the trial court abused its discretion in finding a material and substantial change in circumstances sufficient to warrant a modification and in determining that the modification was in the best interest of the child. Because the evidence is legally insufficient to support a modification, we reverse and render.

## FACTUAL AND PROCEDURAL BACKGROUND

Zeifman and Michels were married on January 12, 1992. Two children were born of their marriage: G.L., a son, on August 13, 1994, and A.A., a daughter, on February 16, 1997. A

divorce decree was signed on August 4, 1998, based upon an "irrevocable mediated settlement agreement" that was filed with the court and incorporated into the decree. *See* Tex. Fam. Code Ann. § 6.602 (West 2006). In the decree, the parties agreed that its provisions could be modified by a court of competent jurisdiction.

The decree named both parents as joint managing conservators. As to the children's education, the decree included a negotiated agreement:

> The Court finds that the parties have agreed and IT IS THEREFORE ORDERED that the children shall attend the University of Texas Lab School until such a time as the children are of the age to attend elementary school. The Court finds that the parties have agreed and IT IS THEREFORE ORDERED that, at that time, the children shall attend the public school in the following order of priority for elementary school: (1) Bryker Woods; or (2) Casis; provided, however, that if neither party lives in a residential area eligible to attend either Bryker Woods or Casis, then the children shall attend elementary school which the children are eligible to attend, at the highest rated school, the highest rating being determined by the annual TAAS testing, using the previous year's rankings, or shall attend another elementary school to which the parties agree in writing. The Court finds that the parties have agreed and IT IS THEREFORE ORDERED that for middle school, the children shall attend the middle school into which the children's elementary school feeds. The Court finds that the parties have agreed and IT IS THEREFORE ORDERED that for high school, the children shall attend the high school into which the children's middle school feeds.

The decree also contained a provision specifying a mechanism if the parties were unable to agree:

> The Court finds that the parties have agreed and IT IS THEREFORE ORDERED that if the parties cannot agree on educational decisions for a child, the parties shall follow the recommendations of the person that is the child's teacher at the time of the decision. IT IS ORDERED that, as child support, Clifford Zeifman and Sheryl Diane Michels Zeifman shall each pay . . . half (½) of the costs referable to the children's attendance at the University of Texas Lab School.

At the time of the divorce, Michels lived in the house that had been the couple's home prior to the divorce, which was within the geographical boundaries for enrollment at Bryker Woods elementary school. Zeifman moved into a house across the street from the school.

Although the parties intended for their son, G.L., to attend Bryker Woods, they learned while he was attending kindergarten that he had learning difficulties. They were able to reach an agreement to move him to a private school that both parents agreed was more suitable to his special needs.

A.A. entered the first grade at Bryker Woods. In April 2004, when A.A. was still in the first grade, Michels applied for her admission to St. Andrew's Episcopal School for the next school year. She did not notify Zeifman of the application. As part of her application, Michels included a recommendation from A.A.'s first-grade teacher at Bryker Woods, and A.A. was tested to determine her academic suitability. On May 3, A.A. was placed on a waiting list for admission and Michels notified Zeifman of her decision to apply for A.A.'s admission to St. Andrew's. In June, A.A. was accepted for admission to the school.

Zeifman objected to the change of schools and insisted that the parties follow the decree, which provided for A.A. to continue her education at Bryker Woods. Michels consulted with A.A.'s first-grade teacher at Bryker Woods who had supplied the application recommendation. The teacher advised Michels she thought "it would be best if [A.A.] stayed at Bryker Woods."

On July 19, 2004, Michels filed a Petition to Modify Parent-Child Relationship, asking the court to modify the decree and award her the exclusive right to make educational decisions regarding A.A. The petition stated that the order to be modified was the Agreed Final

Decree of Divorce that was rendered on August 4, 1998. Michels alleged that (i) the circumstances of "the children or of one or both of the joint managing conservators have materially and substantially changed since the rendition of the order such that the provisions of the Agreed Final Decree of Divorce regarding education are no longer appropriate and in the best interest of the children who are the subject of this suit," and (ii) A.A. had been accepted for admission to St. Andrew's which was a "more exceptional educational opportunity than either [her current school] Bryker Woods or Casis elementary schools."

After a hearing, the trial court modified the decree to provide that Michels has the sole right to make educational decisions for their daughter. The trial court determined that the circumstances of the child had materially and substantially changed since the date of the rendition of the original divorce decree. Finding only that "A.A. is different, times are different, you're remarried, life is different," the trial court concluded that these circumstances constituted material and substantial changes. Turning to the child's best interest, the trial court concluded that it was in the child's best interest for Michels to have the exclusive responsibility for educational decisions.

Although Zeifman requested findings of fact and conclusions of law, the trial court failed to file them.

**ANALYSIS**

In two issues on appeal, Zeifman contends that the trial court abused its discretion in modifying the divorce decree giving Michels the exclusive right to make decisions concerning A.A.'s education. Specifically, Zeifman complains that the trial court abused its discretion in finding a material and substantial change in circumstances sufficient to warrant a modification and that the

4

modification would be in the best interest of the child because the evidence presented at trial was legally and factually insufficient as to both requirements.

**Standard of Review**

We review a trial court's decision to modify conservatorship under an abuse of discretion standard. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *In the Interest of P.M.B.*, 2 S.W.3d 618, 622 (Tex. App.—Houston [14th Dist.] 1999, no pet.). The trial court's order will not be disturbed on appeal unless the complaining party can show a clear abuse of discretion. *Id*. A trial judge is wisely vested with this discretion because she is best able to observe the witnesses' demeanor and personalities. A trial court abuses its discretion if it acts arbitrarily and unreasonably or without regard to guiding rules or principles. *K-Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex. 2000); *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (applying abuse of discretion standard with regard to child support order); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). The mere fact that a trial court decided an issue in a manner differently than an appellate court would under similar circumstances does not establish an abuse of discretion. An abuse of discretion does not occur as long as some evidence of a substantive and probative character exists to support the trial court's decision. *P.M.B.*, 2 S.W.3d at 622.

Under an abuse of discretion standard, legal and factual sufficiency challenges to the evidence are not independent grounds of error, but are relevant factors in assessing whether the trial court abused its discretion. *In re D.M.*, 191 S.W.3d 381, 393 (Tex. App.—Austin 2006, pet. denied); *Dunn v. Dunn*, 177 S.W.3d 393, 396 (Tex. App.—Houston [1st District] 2005, pet. denied). Because we apply an abuse-of-discretion standard to a modification suit, the traditional sufficiency

5

standards of review overlap the abuse of discretion standard, and appellate courts apply a hybrid analysis. *Echols v. Olivarez*, 85 S.W.3d 475, 476 (Tex. App.—Austin 2002, no pet.); *In re D.S.*, 76 S.W.3d 512, 516 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

Once it has been determined that the abuse-of-discretion standard applies, an appellate court engages in a two-pronged inquiry:  (1) whether the trial court had sufficient information on which to exercise its discretion; and (2) whether the trial court erred in its application of discretion.  *Echols*, 85 S.W.3d at 477-78; *Lindsey v. Lindsey*, 965 S.W.2d 589, 592 (Tex. App.—El Paso 1998, no pet.).  The traditional sufficiency review comes into play with regard to the first question; however, the inquiry does not end there. *Echols*, 85 S.W.3d at 478.  The appellate court then proceeds to determine whether, based on the evidence, the trial court made a reasonable decision, that is, that the court's decision was neither arbitrary nor unreasonable. *Id*.

If findings of fact and conclusions of law are properly requested, the trial court's duty to file findings and conclusions is mandatory, and the failure to respond when all requests have been properly made is presumed harmful unless the record shows that the complaining party has suffered no injury. *See* Tex. R. Civ. P. 296; *Tenery v. Tenery*, 932 S.W.2d 29, 30 (Tex. 1996); *Cherne Indus., Inc. v. Magallanes*, 763 S.W.2d 768, 772 (Tex. 1989).  The court must make findings on each material issue raised by the pleadings and evidence, but not on evidentiary issues. *In re Davis*, 30 S.W.3d 609, 614 (Tex. App.—Texarkana 2000, no pet.); *Roberts v. Roberts*, 999 S.W.2d 424, 434 (Tex. App.—El Paso 1999, no pet.).  Because the trial court did not issue any findings of fact or conclusions of law, all facts necessary to support the trial court's ruling and supported by the evidence are implied in favor of the trial court's decision. *BMC Software Belgium, N.V. v.*

6

*Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). But when the appellate record includes both the reporter's record and the clerk's record, as it does here, the implied findings are not conclusive and may be challenged for legal and factual sufficiency. *Vickery v. Commission for Lawyer Discipline*, 5 S.W.3d 241, 251 (Tex. App.—Houston [14th Dist.] 1999, pet. denied). We thus turn to the standard for a challenge to the legal sufficiency of the evidence.

When an appellant attacks the legal sufficiency of an adverse finding on an issue on which he did not have the burden of proof, the appellant must demonstrate on appeal that there is no evidence to support the adverse finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983). A legal sufficiency challenge may be sustained when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998). In determining whether there is legally sufficient evidence to support the finding under review, we examine the record for evidence and inferences that support the challenged finding, while disregarding all contrary evidence and inferences. We must consider evidence favorable to the finding if a reasonable factfinder could, and disregard evidence contrary to the finding unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 828 (Tex. 2005).

In determining a factual sufficiency question, we weigh and consider all the evidence in the record. *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 83 (Tex. 1992). When an appellant attacks the factual sufficiency of an adverse finding on an issue on which he did not have

the burden of proof, the appellant must demonstrate the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). When conducting a factual sufficiency review, a court of appeals must not merely substitute its judgment for that of the trier of fact. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

**Modification of Conservatorship Because of Material and Substantial Change**

To support modification of an order regarding conservatorship, a trial court must find that the modification would be in the best interest of the child and, as it applies to this case, that the circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed since the date of the rendition of the order. Tex. Fam. Code Ann. § 156.101(1) (West Supp. 2005). The party seeking modification has the burden to establish these elements by a preponderance of the evidence. *Agraz v. Carnley*, 143 S.W.3d 547, 552 (Tex. App.—Dallas 2004, no pet.); *In re T.D.C.*, 91 S.W.3d 865, 871 (Tex. App.—Fort Worth 2002, pet. denied); *Considine v. Considine*, 726 S.W.2d 253, 255 (Tex. App.—Austin 1987, no writ). The best interest of the child is always the primary consideration of the court in determining issues of conservatorship. Tex. Fam. Code Ann. § 153.002 (West 2002).

In a conservatorship modification action, a threshold inquiry of the trial court is whether the moving party has met the burden imposed upon him of showing a material and substantial change; otherwise the trial court must deny the motion to modify. *Bates v. Tesar*, 81 S.W.3d 411, 427 (Tex. App.—El Paso 2002, no pet.). To prove that a material change in circumstances has occurred, the petitioner must demonstrate what conditions existed at the time of

the entry of the prior order as compared to the circumstances existing at the time of the hearing on the motion to modify. *Agraz*, 143 S.W.3d at 554; *Considine*, 726 S.W.2d at 255. The petitioner must show what material changes have occurred in the intervening period. *Id.*

### (1) The Petition to Modify Parent-Child Relationship

The only basis asserted in the modification petition to support the requirement of a material and substantial change was A.A.'s application and admission to St. Andrew's. Having gained her daughter's admission to St. Andrew's Episcopal School, Michels filed a modification petition seeking a departure from the negotiated agreement concerning her daughter's education contained in the agreed divorce degree. Zeifman opposed the modification, seeking to continue their daughter's education at Bryker Woods, the public school to which the parties had agreed and set forth in the divorce decree. Although the petition references both children, the parties agree that the modification at issue and the court's order relate only to A.A.

### (2) The Evidence

The testimony showed that the dispute that led to the filing of the petition for modification arose when Michels applied for and obtained A.A.'s admittance to St. Andrew's Episcopal School. As a Jew raising Jewish children, Zeifman opposed the modification because he did not want the child to attend a Christian school and she was thriving at the public school the parties had agreed to in the divorce decree.

The undisputed evidence showed that A.A. progressed successfully through kindergarten, first grade and the beginning of second grade at Bryker Woods prior to trial. In April

9

2004, Zeifman and Michels discussed enrolling A.A. at a private school. Zeifman proposed that A.A. attend the Austin Jewish Academy, but Michels disagreed and rejected the proposal. Michels did not believe the academy had "the academic strengths that I would require for her to be there." Without notifying Zeifman, Michels contacted and applied to St. Andrew's for admission, had A.A. tested, and asked A.A.'s current first-grade teacher for a recommendation. After A.A. was placed on a waiting list on May 3 subject to available openings at the school, Michels notified Zeifman. A.A. was accepted for admission on June 28. On June 30, Michels executed the school's enrollment contract and forwarded a tuition check. She informed the school, "I am working with her father to get his agreement regarding her attendance. Otherwise her enrollment will be subject to modification of our divorce decree."

Zeifman did not agree to enroll A.A. at St. Andrew's, insisting that the parties follow the agreement to send her to Bryker Woods, the public school to which the parties had agreed, and at which the parties agreed she was doing well. Zeifman testified,

> My daughter is thriving at the community public school across the street from my home. And I would only agree to enroll her in something that she had a demonstrable need for, like [G.L.] has a need for a specialized school, or that Sheryl [Michels] and I agreed was a place that was going to better fit our idea of how we want to raise our kids.

As long as A.A. was thriving at Bryker Woods, and there was no demonstrable need to send her to a specialized private school, Zeifman would not agree to send A.A. to a private school other than the Austin Jewish Academy, a school with the religious affiliation in which the parties agreed A.A. was being raised.

10

To support her petition that a material and substantial change had occurred since the rendition of the original divorce decree, Michels offered evidence that in the years since the time of the parties' divorce, A.A. had grown "from an infant to a beautiful, smart, lovely 7-year old girl." She urged that A.A.'s academic abilities and opportunities had surpassed the expectations the parents had at the time of the divorce decree. In support of the modification order, Michels testified,

Q: At the time, did you have any idea that there would be an opportunity for her to attend St. Andrew's school?

A: No I did not.

. . . .

Q: What other—now other than the mere passage of physical time, have there been other changes that have occurred—significant changes that have occurred in either your life or in Mr. Zeifman's life?

A: I believe there have been significant changes.

Q: And could you tell the Court what those are.

A: In my life or—

Q: Well, let's start with your life.

A: Okay. Well, since the—since September of '97, that's been quite a bit of time, I think I've grown in a lot of ways. My children have grown up, and I've certainly learned from them. I've grown as a parent. Hopefully, as a big sister, as a daughter, as a friend, as a person, as a physician, as all of those things in these years of life experience. I think I'm happier and hopefully smarter.

Q: How has your daughter changed?

A: She's grown up from an infant to a beautiful, smart, lovely seven-year-old girl. She's proved herself to be social, a gymnast, a cheerleader, smart in school. Academically, she's very, very bright. She's basically grown up from an infant to a young child with extraordinary potential.

11

Q: And has she—at the time that she was 14 months old and you entered into this agreed divorce decree, did you have any idea for sure how she was going to turn out?

A: No.

. . . .

Q: And did you come to a—what about your daughter, did you have idea how smart she was going to be?

A: No. I had hoped, but I didn't know.

Michels acknowledged that her daughter was doing very well at Bryker Woods.

Much of the testimony adduced by Michels centered on St. Andrew's reputation as a high achieving school and the desirability of a child remaining in a single school through high school as she would be able to do at St. Andrew's. Michels's partner in her medical group testified that he served on the St. Andrew's board of trustees, that his children attended St. Andrew's, that the school sets a high academic standard and provides a diverse culture respectful of various religions, and that he is familiar with A.A. but has not "seen [her] in years, but I know who she is."

Education consultant Christopher Kocerik testified that he was first contacted by Michels on July 8, 2004. Michels advised him that "she had identified a school that she thought was best, and wanted me to concur if—or give my opinion on as to whether or not that was the best school for her." Michels told Kocerik that a "custody" matter was involved and that he might be called upon to testify. Kocerik did not investigate other schools or make a recommendation regarding schools. He testified, "She asked us to look at her daughter's needs, and look at the option

of St. Andrew's."  Kocerik concluded that St. Andrew's would be a "good match" and a "good opportunity" for A.A.

The lawyer who represented Michels in her divorce also testified on her behalf.  She had observed A.A. since the divorce and testified that "she's grown up, she's become a lot more articulate and it is striking how bright she is."  She also testified to the benefits of private school over public school.  Lucy Nazro, the head of St. Andrew's, testified that, based upon A.A.'s test scores, she would do well at St. Andrew's.  She explained that the school offers continuity through high school to its students as well as other opportunities not offered by the public schools such as public service opportunities, foreign languages, and ethics courses.  Dr. Nazro testified that she had a telephone conversation with Zeifman in which they discussed the academics of the school and he inquired into the religious life of the school, particularly the practice of daily chapel.

Zeifman testified that he lives across the street from Bryker Woods and has remarried.  Because he lives so close, he drops by the school once or twice a week and "bump[s] into the principal fairly often."  He testified to his son's learning disability and that he and Michels agreed to deviate from the agreement to meet their son's special educational needs.  Zeifman testified that A.A.'s academic and social needs were being met at Bryker Woods and that she was thriving there.  When Michels rejected his suggestion that A.A. attend the Austin Jewish Academy and applied instead to St. Andrew's without his knowledge or consent, Zeifman insisted upon following the decree and having A.A. continue her education at Bryker Woods.  He testified that the academics of the schools was never an issue: "You know, we're in a very good public school, and my daughter,

13

as evidenced by all the results that have been admitted, has been pretty well served by whatever we're doing."

Casey Herrin, A.A.'s first-grade teacher testified that she had taught first grade at Bryker Woods for five years and that A.A. had been in her class. Herrin described A.A. as a "very pleasant, very bright" "typical first grader." She was among the top students in the class but had not been accepted for the gifted and talented program. Herrin testified that both parents were involved and concerned about their daughter's academic progress: "They both did make sure to frequently check with me to make sure she was progressing as she should be." A.A.'s stepmother was also involved at the school.

At Michels's request, Herrin had completed the recommendation form that accompanied A.A.'s application for admission to St. Andrew's. At the time of its submission, Herrin learned that Zeifman was not aware that Michels had asked her to fill out the recommendation. She knew that Michels was interested in sending her daughter to St. Andrew's: "And I felt like, obviously, this was something that her parents were going to decide, and that it was my obligation as her former teacher to go ahead and fill this out for her." Over the summer, probably in June, Michels asked for her assistance in helping the parents decide which school A.A. should attend. Herrin testified,

> I told her that I'd have to think about it and get back to her. And when I eventually got back to her, I informed her that I thought it would be best if [she] stayed at Bryker Woods. . . . I felt like at one point both parents, obviously, agreed that Bryker Woods was a good school for [her]. And so I thought best just leave it alone. . . . I didn't feel like there was any strong need that wasn't being met at Bryker Woods.

14

Herrin testified that she told Michels that "I thought it would be best if A.A. stayed at Bryker Woods." They had no further conversations. In response to cross examination, Herrin testified that Zeifman expressed concerns to her that he thought Bryker Woods was a good school for his daughter and he had some concerns that St. Andrew's was a religiously affiliated school.

A Bryker Woods counselor and the principal also testified to the suitability of the school for A.A.'s needs and its standing in the academic community. The counselor testified that A.A.'s needs were "absolutely" met at the school and that her current second grade teacher was "one of the most highly professional teachers I've ever worked with." The principal testified that the school is a "wonderful little school" that is unique because it is a school of choice for half of its 378 enrolled students. The school was generally rated "exemplary" in its academic ranking by the Texas Educational Association but had dropped to "recognized" in the 2003/2004 year. He attributed the change to the addition of the science portion of the test. All of the other test scores had been in the exemplary range over the cut-off score of ninety percent. He testified that the school is a well-regarded school with extensive parental involvement and small class sizes. He knows most of the students by name and is familiar with A.A. He testified that she "seems like a great child" who gets along well with other students. He testified,

> I feel that [she] is doing a fine job, you know, in second grade. I think that she has a wonderful classroom teacher, very caring classroom teacher, and a very experienced teacher. That's the other good thing that I will like to share also about Bryker Woods is we have very little teacher turnover. The teachers who have been there have been there for many, many years. . . . [I]t's a wonderful environment. It's a small school . . . a great place.

15

At the conclusion of the trial, the trial judge told the parties that she was "puzzled to have such an issue brought before this Court" and that she had "struggled listening to the testimony" that "veered off course in some ways" from the issues, stating,

> I became extremely frustrated with the concept that I'm supposed to decide that St. Andrew's is better than the AISD school system for your child. Even if I accept that St. Andrew's is a premier school and better than AISD, is that really the issue? Because it really isn't about whether Harvard is better than UT. It really is about where the child will actually flourish. And I'm not sure I understand or know that answer. And I struggled all last evening with what my role was today. Am I supposed to tell you your child will be more successful at St. Andrew's, or your child will be more successful in the AISD School District.

**Legal Sufficiency of the Evidence**

The issue is whether the trial court's determination that there was a material and substantial change in circumstances was an abuse of discretion. Based on the evidence, we conclude that it was.

A court's determination as to whether a material and substantial change of circumstances has occurred is not guided by rigid rules and is fact specific. *In re Z.B.P.*, 109 S.W.3d 772, 779 (Tex. App.—Fort Worth 2003, no pet.). Evidence of a parent's subsequent marriage to another can constitute a relevant, material change of circumstances after rendition of the decree sought to be modified. *In re C.Q.T.M.*, 25 S.W.3d 730, 735 (Tex. App.—Waco 2000, pet. denied). Likewise, change in the age of a child may constitute a material change. *In re Davis*, 30 S.W.3d 609, 615 (Tex. App.—Texarkana 2000, no pet.); *see also Horne v. Hardwell*, 533 S.W.2d 450, 452 (Tex. Civ. App.—Austin 1976, writ ref'd n.r.e.). Increase in age alone is not a changed circumstance to justify modification unless changed needs are shown. *E.g.*, *Voros v. Turnage*, 856 S.W.2d 759, 762

16

(Tex. App.—Houston [1st Dist.] 1993, writ denied); *Randle v. Randle*, 700 S.W.2d 314, 316-17 (Tex. App.—Houston [1st Dist.] 1985, no writ).

In any event, the cases finding a material change based on a change in the age of a child are distinguishable from this case. None of the cases in which a court found the change in the age of a child to support a modification included a negotiated agreement that specifically contemplated the change and provided a dispute resolution mechanism as in this case. To allow aging alone to constitute a material and substantial change in the face of the agreement would render both the agreement and the language of the statute meaningless.

Although courts have allowed changes to be proved in a variety of ways, they have consistently required that a change be proved and that it be shown to be substantial and material. *See*, *e.g.*, *Agraz*, 143 S.W.3d at 554 (evidence that father not participating in raising children insufficient to show prior conditions or material change); *London v. London*, 94 S.W.3d 139, 144 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (court compared financial circumstances of the affected parties at time of original order with circumstances at time modification sought finding changed circumstances); *Echols*, 85 S.W.3d at 479 (court found changed circumstances included aging of child, remarriages and additional children in both families); *Considine*, 726 S.W.2d at 255 (re-marriage by one party and relocation to Canada held insufficient). In *Considine*, this Court stated that "to prove that a material change of circumstances has occurred, the movant must demonstrate what conditions existed at the time of the entry of the prior order. Once such conditions have been established, the movant must show what material changes have occurred in the intervening period."

17

726 S.W.2d at 255.[1]  In that case, we concluded that a parent's remarriage and change of residence to Canada did not constitute a material and substantial change as to support the modification of conservatorship.  *Id.*

Zeifman contends that there was no showing that the circumstances with respect to A.A.'s education have materially and substantially changed.  We agree.

A.A. was an infant when the parties divorced and in second grade when the case was tried in October 2004.  The change alleged in the petition was her application and admission to St. Andrew's.  At trial, in response to specific questioning as to the change in circumstances, Michels testified only that the change was that A.A. had grown from an infant into a "beautiful, smart, lovely" seven-year-old and that her academic ability had surpassed Michels's expectations at the time of the divorce.  At the time of the divorce, the parties entered into a negotiated agreement that their children would attend certain schools.  They further agreed that if they were unable to agree on educational decisions, they would follow the recommendations of the teacher of the child at issue.  Thus, the agreement contemplated that the child would age, specified the schools agreed upon and even the alternatives, and provided a mechanism for dispute resolution should a disagreement arise.

---

[1] For the trial court to determine if a material and substantial change has occurred, most courts require a comparison between the original circumstances of the child and the affected parties at the time the existing order was entered with their circumstances at the time the modification is sought.  *E.g.*, *London v. London*, 94 S.W.3d 139, 144 (Tex. App.—Houston [14th Dist.] 2002, no pet.).  Thus, the record must contain both historical and current evidence of the relevant circumstances.  Without both sets of data, the court has nothing to compare and cannot determine whether a change has occurred.  *Id*. at 144-45.

When a disagreement arose in the instance of their son's special educational needs, the parties resolved the change pursuant to the terms of the agreement.

The evidence showed that after the parties divorced they continued to raise A.A. in the Jewish faith and they continue to adhere to that faith. A.A. attends religious school at Congregation Agudas Achim and pursues other activities and camps sponsored by the Jewish Community Center. The parties agree she is being raised Jewish and is part of the Jewish community, as she has been since she was born. The modification sought specifically to allow Michels to send A.A. to St. Andrew's would mark a significant change in the child's secular and religious education. That Zeifman objected to A.A. attending a religious private school based upon a different faith is consistent with the parties' intent to specify these educational decisions in their agreement to anticipate and avoid such conflicts.

The evidence showed that A.A. is a bright and academically talented girl who is thriving at Bryker Woods, a school located across the street from her father's home. The undisputed evidence also showed that she did very well academically and socially at Bryker Woods, and that her academic and social needs were being met. The only evidence that she might do better at St. Andrew's or that it might be more "suitable" is speculative and, in any event, not sufficient to constitute a material and substantial change.

We do not agree that this evidence shows a change in circumstances as contemplated by section 156.101. *See* Tex. Fam. Code Ann. § 156.101. To accept Michels's interpretation of the requirement of a "material and substantial" change would render its language meaningless if age alone were sufficient in light of the parties' prior agreement. Although there may be a variety of

19

methods of showing material and substantial change, the requirement is that a change must be shown. We conclude Michels's evidence is no evidence of a change in conditions. Even assuming that the St. Andrew's application and admission or A.A.'s change of age constituted changes not contemplated by the agreement, there was no evidence that either change was material or substantial.

Moreover, as in all suits regarding the conservatorship of a child, the court's primary consideration "shall always be the best interest of the child." Tex. Fam. Code Ann. § 153.002; *In re V.L.K.*, 24 S.W.3d 338, 342 (Tex. 2000). A court may use the nonexhaustive list of *Holley* factors to determine the child's best interest. *Holley v. Adams*, 554 S.W.2d 367, 371-71 (Tex. 1976). Those factors include the desires of the child, the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of the individuals seeking custody, the programs available to assist these individuals to promote the best interest of the child, the plans for the child, the stability of the home, the acts or omissions of the parent, which may indicate that the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of the parent. *Id*. at 371-72. In the context of custody modification, other factors to be considered include the child's need for stability and the need to prevent constant litigation in child-custody cases. *V.L.K.*, 24 S.W.3d at 343.

The policy behind the requirement of a material and substantial change is to prevent constant relitigation with respect to children. *In re M.N.G.*, 113 S.W.3d 27, 33 (Tex. App.—Fort Worth 2003, no pet.); *Watts v. Watts*, 563 S.W.2d 314, 316 (Tex. Civ. App.—Dallas 1978, writ ref'd n.r.e.) (requirement of material and substantial change predicated upon doctrine of *res judicata* as to best interest of child at time of original decree awarding conservatorship). When establishing the

20

means to modify custody orders, the legislature established a system that attempts to create stability in the conservatorship. *See Burkhart v. Burkhart*, 960 S.W.2d 321, 323 (Tex. App.—Houston [1st Dist.] 1997, pet. denied). Thus, the party seeking modification bears the burden of demonstrating a material and substantial change in circumstances since the original decree. *Bates*, 81 S.W.3d at 423. The requirement of this showing "serves a valid purpose of significantly limiting the trial judge's discretion and prevents the modification statute from being unconstitutionally broad." *M.N.G.*, 113 S.W.3d at 34.

Although the trial court heard contradictory testimony about events that had occurred between the parties, the undisputed evidence established that A.A. was thriving at Bryker Woods under the educational plan agreed to in the divorce decree. Much of the testimony focused on the relative academic standing of the two schools as well as the advantages of a private school over a public school. Michels acknowledged that A.A. was doing very well at Bryker Woods and that she would not be harmed by staying at Bryker Woods. A.A.'s teacher, who provided the recommendation for her admission to St. Andrew's, testified that she believed that it would be in A.A.'s best interest to stay at Bryker Woods. There was no expert testimony or other evidence that the change in schools would be in A.A.'s best interest. Because A.A. was making good grades and thriving at Bryker Woods, and there was no evidence to show that it was in her best interest to change schools, a review of the record does not establish that the evidence is sufficient to support the trial court's findings.

At the time of their divorce, the parties chose to send their children to public schools unless they agreed otherwise. They also correctly anticipated that they might disagree about

21

educational decisions concerning the children in the future and included an agreed mechanism in the decree for resolving any such disagreements.

We would be remiss if we did not observe that, with the passage of the Texas Alternative Dispute Resolution Act, it became public policy to "encourage the peaceable resolution of disputes, with special consideration given to disputes involving the parent-child relationship, including the mediation of issues involving conservatorship, possession, and support of children, and the early settlement of pending litigation through voluntary settlement procedures." Tex. Civ. Prac. & Rem. Code Ann. § 154.002 (West 2005). It would undermine the efforts of mediated settlement agreements for us to allow a modification on circumstances that were clearly contemplated by the parties at the time of the rendition of the original divorce decree. We also observe, however, that the existence of a mediated settlement agreement does not alter the requirements of section 156.101; we hold only that, on the record before us, the petitioner failed to carry her burden of demonstrating a material and substantial change of circumstances and that the modification would be in the best interest of the child. *See* Tex. Fam. Code Ann. § 156.101.[2]

## CONCLUSION

We conclude that the evidence is legally insufficient to support the trial court's finding that the circumstances of the child, as specifically alleged in the petition, or of either conservator have materially and substantially changed. We hold that, based on the record before us, the trial court abused its discretion in ordering modification. We sustain appellant's challenge to the

---

[2] Because of our disposition of the legal sufficiency issue, we need not address the remaining issues regarding factual sufficiency.

22

legal sufficiency of the modification. We reverse the trial court's order to modify and render judgment in favor of Zeifman.

_____

Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Pemberton: Opinion by Justice Patterson; Concurring Opinion by Justice Pemberton

Reversed and Rendered

Filed: August 4, 2006