# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-15-00115-CV

**Michel Lee Jordan, Appellant**

**v.**

**Robert E. Lavigne, Appellee**

---

### FROM THE DISTRICT COURT OF BELL COUNTY, 426TH JUDICIAL DISTRICT
### NO. 254,080-E, HONORABLE FANCY H. JEZEK, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellant Michel Lee Jordan is A.G.J.'s biological father. Appellee Robert E. Lavigne is her stepfather. Jordan appeals from the trial court's order naming him and Lavigne joint managing conservators of A.G.J., giving Lavigne the right to determine A.G.J.'s primary residence, granting Jordan visitation under a standard possession order, and ordering Jordan to pay Lavigne about $600 a month in child support. We affirm the trial court's order.

### Standard of Review

Texas' public policy is to ensure that a child has frequent and continuing contact with her parents, if her parents have shown they can act in the child's best interest; to provide the child with a safe, stable, and nonviolent environment; and to encourage parents to share in the raising of their child after separation. Tex. Fam. Code § 153.001(a). A child's best interest is the overarching concern in matters concerning conservatorship, possession, and access to the child. *Id*. § 153.002.

A trial court may modify an order governing the conservatorship of a child if the change would be in the child's best interest and if the circumstances of the parents or the child have materially and substantially changed since the order was rendered. *Id.* § 156.101(a)(1). We will not disturb a trial court's decision on a motion to modify unless the complaining party shows a clear abuse of discretion, meaning the trial court acted in an arbitrary and unreasonable manner or without reference to guiding principles. *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.). We ask first whether the trial court had sufficient information on which to exercise its discretion and second whether it erred in applying its discretion. *Id.* at 477-78. A "traditional sufficiency review comes into play with regard to the first question," followed by a determination of "whether, based on the elicited evidence, the trial court made a reasonable decision." *Id.* at 478. The trial court is best able "to observe the demeanor and personalities of the witnesses and [to] 'feel' the forces, powers, and influences that cannot be discerned by merely reading the record." *Id.* at 477. The fact that we might decide the issue differently than the trial court does not establish an abuse of discretion. *Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied). "An abuse of discretion does not occur as long as some evidence of a substantive and probative character exists to support the trial court's decision." *Id.*

### Factual and Procedural Summary

A.G.J. was born in November 2007 to Jordan and Tanja Jordan. When Tanja and Jordan divorced in 2012, Tanja was appointed sole managing conservator, and Jordan was appointed possessory conservator, ordered to pay $617 in monthly child support, and allowed supervised visitation every other week. The trial court found in its decree that Jordan had "a history or pattern

2

of committing family violence during the two-year period preceding the filing of this suit or during the pendency of this suit" and that giving him unsupervised access to his daughter would not be in her best interest. Tanja died from a toxic combination of prescription drugs on October 2, 2013, and on October 3, Lavigne filed a petition seeking to be named A.G.J.'s sole managing conservator. Following a hearing, the trial court signed an order naming Jordan and Lavigne joint managing conservators and giving Lavigne the right to determine A.G.J.'s primary residence, giving Jordan visitation under a standard possession order, and ordering him to pay $606 a month in child support.

The trial court made the following relevant findings of fact, none of which are challenged on appeal by Jordan[1]:

- Lavigne was married to Tanja, was A.G.J.'s stepfather, and had standing to seek conservatorship.[2] Lavigne and A.G.J. had a parent and daughter relationship.

- ln early October 2013, Tanja injured her back and started taking muscle relaxers and pain medication. She died on October 2, 2013. Although Jordan claimed that Lavigne had murdered Tanja, her death was ruled accidental.

- Since Tanja's death, A.G.J. had started seeing a therapist, who had no concerns about her relationship with Jordan or Wendy Jordan, who is Jordan's wife. A.G.J. "expressed concerns" that Lavigne had not returned certain items to A.G.J., and A.G.J. told the therapist that she did not want to see Lavigne. The therapist did not know of Jordan's history of family violence against Tanja and did not recall that Jordan had informed her that he had been limited to supervised visitations with A.G.J.

- Tanja's friend Teresa Sims testified: that Jordan typically arrived late to visitation and left early; that A.G.J. loved Lavigne; that on the day Tanja died, Jordan and Wendy arrived at

---

[1] When findings of fact are unchallenged, "[t]hey are binding on an appellate court unless the contrary is established as a matter of law, or if there is no evidence to support the finding." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986).

[2] *See* Tex. Fam. Code § 102.003(a)(9) (person other than foster parent has standing to file suit affecting parent-child relationship if he has had actual care, control, and possession of the child for at least six months within ninety days of filing of petition).

3

Tanja's house, which she was awarded in her divorce from Jordan, announced that the house was now Jordan's, and the next day posted an "eviction notice" telling Lavigne to leave within thirty days. Sims also testified that shortly after Tanja's death, Jordan and Wendy "snatched" A.G.J. from Lavigne, and that since that time, Sims had tried to call A.G.J. but had not received any return calls after leaving numerous messages on Jordan's phone.

- Henry Bisson, Tanja's paramedic partner, often heard Jordan use profane language to Tanja. Bisson indicated that before Tanja's death, Jordan "had expressed interest in terminating his parental right to A.G.J. so that [Lavigne] could adopt."

- Elgin Henke, A.G.J.'s maternal grandmother, testified that she has been seeing A.G.J. once a month while A.G.J. has been in Jordan's care. Henke did not believe Tanja's allegations of domestic violence by Jordan.

- Lavigne frequently cared for A.G.J. because Tanja had an "erratic work schedule" as a paramedic. Lavigne testified that he attended A.G.J.'s school functions, was listed as an emergency contact, and kept A.G.J. overnight when Tanja worked an overnight shift. He also testified that Jordan did not call A.G.J. regularly before Tanja died and that he and Tanja regularly took A.G.J. to visit Henke and her husband.

- Lavigne testified that he was the beneficiary of a $100,000 life-insurance policy and that he had invested those funds on A.G.J.'s behalf. The court also found that "Met Life manages additional sums for the child in the amount of $147,000."

- Shortly before Tanja's funeral, Jordan and Wendy came to Tanja's house and took A.G.J. "kicking and screaming from the residence." On November 4, 2013, Lavigne and Jordan agreed that A.G.J. would visit Lavigne monthly, but after one visit, Jordan and Wendy moved and did not tell Lavigne their new address.

- Wendy admitted that when she and Jordan entered into the agreement allowing Lavigne to have court-ordered visitation, they had already decided "that the child was not going to have anything to do with [Lavigne]." Wendy testified that she and Jordan "would probably not follow any orders that awarded custody or possession" to Lavigne.

- Jordan admitted that he was delinquent on court-ordered child support for two children who lived in Colorado, that he had the ability to make the payments, and that he "made a decision to violate the order."

- Jordan denied that he was seeking custody of A.G.J. to get access to money. Jordan did not believe visits with Lavigne were in A.G.J.'s best interest and testified that Lavigne "had not surrendered certain items of [Tanja's] personal property" to A.G.J.

4

The court concluded that Lavigne had standing to seek modification, that A.G.J.'s circumstances had changed since the prior order appointing Tanja as sole managing conservator and Jordan as possessory conservator, that modification of the prior order was in A.G.J.'s best interest, and that it was in A.G.J.'s best interest for Jordan and Lavigne to be appointed joint managing conservators with Lavigne having the exclusive right to designate A.G.J.'s primary residence. The court also concluded that, at the time the previous order was signed, the court had found that Jordan had a history or pattern of family violence and that allowing him unsupervised access to A.G.J. would not be in the child's best interest; that Jordan had not obeyed court orders allowing Lavigne access and contact to the child; and that Jordan had indicated that he intended to continue to ignore court orders if he believes they are not in the child's best interest.

In addition to the findings and conclusions recited above, witnesses testified as follows:

- Lavigne testified that he and Tanja started living together in August 2012, exchanged rings on March 14, 2013, and held themselves out as husband and wife. He testified that he was involved in and responsible for A.G.J.'s daily care and when asked what their relationship was, he said, "I was her daddy." He also said that he was designated in school records as one of A.G.J.'s care givers and that at school functions, he identified himself as her father. A.G.J. generally called Lavigne "Daddy."

- Lavigne said that although Tanja did not have a close relationship with her parents, she wanted A.G.J. to have a relationship with them, so she and Lavigne would take A.G.J. to visit Tanja's parents at least once a month. Lavigne testified that he informed Tanja's parents of her death and that immediately after her death, they came to the house and tried to remove some items. He objected that he did not want anything removed and said "Tanja wasn't even buried yet. It was like a bunch of vultures coming in." Lavigne did return a number of items to Tanja's parents at some point after Tanja's death.

- Lavigne testified that after Tanja died and Jordan took A.G.J. from her home with Lavigne, he was given court-ordered visitation with A.G.J. He made the four-hour drive to Tyler for a visitation, bringing a number of items he had been asked to gather for A.G.J., but when he

arrived, there was only a mailbox at the address. Jordan had not informed Lavigne that he had moved with A.G.J. to a new address, and as of the date of the hearing, Jordan still had never given Lavigne A.G.J.'s new address.

- Lavigne said he and Tanja each took out life insurance policies, naming one another as beneficiaries, and he had put the funds paid from Tanja's policy into a mutual fund for A.G.J.'s benefit. He also testified that Tanja left A.G.J. about $147,000 in funds that were held by MetLife for A.G.J.'s benefit. Lavigne feared that if Jordan had control over A.G.J.'s funds, "all that money's going to be blown."

- Lavigne believed that it was in A.G.J.'s best interest to live with him instead of Jordan because "I'm more financially stable. I have better [morals] and values. I was raised properly." He also said that it was Tanja's wish for him to responsible for A.G.J.'s daily care, not Jordan. Finally, he said, "I raised her, you know, when someone leaves her life and comes in afterwards, you know, I don't think you should get a redo, you know." He said, "I love her with all my heart and soul." If he was given custody of A.G.J., they would live at his house in Copperas Cove, where he had a room set up and decorated for her, and he would take her to see her maternal grandparents.

- Sims testified that A.G.J. was bonded to Jordan, who behaved appropriately in the visitations she observed, but that he was disrespectful and "very mean" to Tanja and frequently used profanity and screamed at her. Sims also testified that Lavigne and A.G.J. had a close father-daughter bond and that immediately after Tanja's death, A.G.J. clung to Lavigne while he took care of her, answered "her questions as honestly as he could," told her he loved her, and told her that everything would be okay.

- Sims, Lavigne, and the Jordans all testified about the Jordans taking A.G.J. from her home with Lavigne shortly after Tanja's death. Sims testified that A.G.J. and Wendy were in the backyard playing while Lavigne and Jordan talked in the front yard when Sims "heard Wendy yell, 'Come on.' And she had grabbed [A.G.J.] up and threw her in the backseat [of] the car screaming—or truck—screaming, and hollering, and crying. And then [Jordan] got in the truck and they drove off." Lavigne's testimony was similar. Wendy and Jordan admitted that they carried A.G.J. to their truck and drove away and that A.G.J. was initially upset and did not understand what was happening. They said she quickly calmed down and was no longer upset about having been taken from Lavigne's care. Jordan explained that he was not trying to kidnap A.G.J. but instead was trying to reunite with his child.

- Wendy testified that she loved A.G.J. and considered her to be her daughter. She also said that A.G.J. was thriving and doing well in school and that A.G.J. told her she did not want to go back to Lavigne's care. Wendy said that Lavigne had not given A.G.J. any family photos or family albums. She hoped to be able to adopt A.G.J. Wendy denied telling friends recently that she and Jordan "were out buying lots of things."

6

- Jordan testified that he decided not to let Lavigne have visitation with A.G.J. because she came home from her first visit "extremely upset" because Lavigne would not let her go into her mother's room to look at her things and told her that a judge was going to make her live with Lavigne. Jordan claimed that he told his attorney that the family had moved and that it was not his fault if Lavigne or Lavigne's attorney had not been told the new address.

- Jordan said that A.G.J. wanted to have pictures, clothing, and jewelry belonging to Tanja, but that Lavigne would not return all of the items she had requested.

- Jordan testified that as a result of Tanja's death, A.G.J. gets about $1,168 in monthly social security benefits, which he and Wendy put into their account and use to pay bills and provide for A.G.J. Jordan denied ever agreeing to terminate his parental rights to A.G.J.

- Wendy testified that Jordan owed more than $30,000 in delinquent child support for his children in Colorado. Jordan admitted to being seriously behind in his Colorado child support payments and said he had "decided not to pay" because he had been unable to have contact with the children.

- Bisson was asked to describe Lavigne's relationship with A.G.J., and he said, "A father and daughter would be the best way to describe it. She called him daddy. Originally she called him bob bob. But eventually once [Tanja and Lavigne] became husband and wife, to everyone's knowledge, she started calling him daddy and she referred to him as my daddy." He also said, "There was no hesitation that she would go and hug [Lavigne], hold him by the neck and—and just squeeze him in ways that you don't normally see a child with another person doing." Bisson testified that Tanja had no concerns about leaving A.G.J. alone with Lavigne.

- Henke testified that Jordan loved A.G.J. and treated her like a "little angel" and that A.G.J. loved Jordan and was "daddy's girl." Henke said that since A.G.J. went to live with Jordan, she had started to think Lavigne is "a liar" who "stole everything from her." Henke said Lavigne moved from the house he had shared with Tanja, took all of A.G.J.'s belongings, and had not given A.G.J. any photos of Tanja or other personal items. Henke also said A.G.J. told her "that she has to kiss [Lavigne] in the evening and has to sleep with him while he wants to smell her like he smelled her mother. And this concerned me." Henke thought it was in A.G.J.'s best interest to not have contact with Lavigne.

## Discussion

Jordan challenges the court's determination that it is in A.G.J.'s best interest to modify the conservatorship order and asserts that the *Holley* factors weigh in favor of placing the

child with him, not Lavigne, pointing to testimony by Henke, Jordan, and Wendy.[3] However, it was for the trial court to evaluate witness credibility and resolve factual disagreements. *See Zeifman*, 212 S.W.3d at 587; *Echols*, 85 S.W.3d at 477-78. Lavigne, Sims, and Bisson all testified that Lavigne had a strong bond with A.G.J., Lavigne had been one of A.G.J.'s two primary caretakers up until Tanja's death, Lavigne put Tanja's life insurance proceeds aside for A.G.J.'s benefit, Jordan and Wendy took a crying and upset A.G.J. from Lavigne's care shortly after her mother's death and then neglected to inform Lavigne of their new address after agreeing to court-ordered visitation, and Jordan was significantly in arrears on his Colorado child-support obligation. The record contains substantive and probative evidence on which the trial court could have decided that A.G.J.'s best interest would be better served by living primarily with Lavigne. *See Zeifman*, 212 S.W.3d at 587.

The trial court did not abuse its discretion in determining that it was in A.G.J.'s best interest to live primarily with Lavigne. *See id.* We overrule Jordan's issue on appeal and affirm the trial court's order.

_____

David Puryear, Justice

Before Justices Puryear, Pemberton, and Bourland

Affirmed

Filed:   July 20, 2016

---

[3]  *See Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976) (nonexclusive list of factors to be considered in modification proceeding).