**AFFIRMED and Opinion Filed November 16, 2018**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

_____

**No. 05-18-00733-CV**
_____

**IN THE INTEREST OF S.H AND S.H., MINOR CHILDREN**

**On Appeal from the 303rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. 14-23164-V**

## MEMORANDUM OPINION
Before Justices Francis, Fillmore, and Whitehill
Opinion by Justice Francis

Appellant is the mother of twins S.H. and S.H. In this appeal, she challenges the trial court's judgment appointing the twins' father, R.H., as their sole managing conservator. In a single issue, Mother contends the evidence is legally and factually insufficient to support the jury's verdict. We affirm the trial court's judgment.

The twins were born in October 2003. Mother and Father were married two months later, but ceased living together in 2009. After the separation, the twins lived with Father until 2010 when they returned to Mother. The twins lived with Father again from 2011 until April 2013 when Mother took them out of school and removed them from Father's custody. Father stated he did not attempt to regain custody because he felt the children needed stability. Mother filed a petition for divorce in December 2014 and a final divorce decree was signed on January 6, 2016.

On September 19, 2016, the Dallas County Child Protective Services Unit of the Texas Department of Protective and Regulatory Services received a referral involving the twins and their

older half-sister, K.J. Mother called the police to report that K.J. had been raped and said she moved the children to a shelter for safety. During the investigation of the referral, Mother reported numerous acts of sexual abuse of the children. One allegation was that her brother and ex-boyfriend were working together to sexually abuse them. She believed her best friend was plotting with her ex-boyfriend to sexually abuse K.J. Mother claimed K.J. made an outcry of rape against Mother's current boyfriend, but she believed he and K.J. were in a relationship and K.J. was pregnant with his child. Mother said while the twins were staying with Father, he was observed touching and kissing them inappropriately. The children denied any sexual abuse had occurred and K.J. stated she had never met Mother's boyfriend.

On October 20, the case was transferred to investigator Natica Worthy. Worthy testified she made an appointment to meet with Mother but no one was at the apartment at the scheduled time. Mother called Worthy later that night and demanded she return stating she could not stand to have her child sneaking around behind her back and having a relationship with her boyfriend. Mother threatened to put K.J. out on the street. Because Worthy was concerned for K.J.'s safety, she reported the matter to the police. Worthy was told the police had already been called to Mother's apartment and that Mother had allowed K.J. back inside.

When Worthy met with Mother and the children the next day, they discussed the allegations of sexual abuse. After speaking with the children alone, Worthy was not concerned that sexual abuse was occurring, but felt the family needed counseling. Worthy sought assistance from the Family Based Safety Services division and, during a meeting with a FBSS counselor, Mother admitted to using marijuana to help her sleep.

On December 1, Worthy received a call from Sergio Torres, a Victim Intervention Specialist at Parkland hospital. Mother and the children were in the psychiatric ward. Torres

spoke with the children and was concerned for their safety. They told him their mother heard voices and saw people who weren't there.

The same day, Worthy received a second referral regarding new allegations made by Mother that her brother and ex-boyfriend were sexually abusing the children. The report stated Mother had begun checking the children's private parts and she said she saw scratches and bruising. The children continued to deny any sexual abuse had occurred and examinations showed no physical signs or symptoms of abuse.

When Worthy arrived at the hospital, she found the children in a room with a nurse. The nurse informed Worthy they were on suicide watch. Worthy spoke with a psychiatrist who said Mother had been placed on a forty-eight hour hold to be evaluated. Mother told the psychiatrist she had been molested by her brother when she was younger and no one helped her. The psychiatrist felt Mother was reliving the trauma of her childhood through her children. Worthy spoke with Mother about temporarily placing the children with relatives but she refused to allow it "for security purposes." Mother wanted the children with CPS and asked that they be placed in separate homes. The twins gave Worthy a contact number for Father, but Worthy could not reach him.

The next day, CPS filed a motion to modify a prior order in a suit affecting the parent-child relationship and a petition for protection, conservatorship and termination of parental rights in Mother and Father's divorce case. The trial court signed an ex parte order for emergency care and temporary custody appointing CPS as temporary managing conservator of the twins. They were placed in foster care but ten months later were placed with Father. On March 20, 2018, Father filed a counter petition seeking to become the twins' sole managing conservator, which CPS supported.

A jury trial was conducted on the conservatorship issue. Brooke Johnson, a conservatorship worker with CPS, testified Mother was offered various services including parenting classes, a drug and alcohol assessment, individual counseling, and a psychological and psychiatric evaluation. Of those, she only completed the psychological and psychiatric evaluation and she refused to submit to drug testing. She was often aggressive and would not consistently show up for scheduled visitation with the children. Mother continued to make allegations of sexual abuse of the children throughout the pendency of the case. All of the allegations were investigated and found unsupported. Additionally, Johnson was concerned about Mother being able to see the children unsupervised. She was having delusions and seeing and talking with people who weren't there. Although Mother reported being diagnosed with schizophrenia in 2009, Johnson had no record of her receiving treatment.

Johnson visited the twins regularly after they were placed with Father and saw significant positive improvement. They appeared happier, more secure, and stable. They were able to open up more to others and they had a loving relationship with Father. They both indicated they wanted to live with Father.

Rasheda Warren, a licensed professional therapist who counseled the twins, testified that when she first met with them, they showed signs of chronic traumatic stress. One admitted to self-mutilation as a result of interaction with Mother and said Mother took her to the hospital because she suspected she was involved in sex trafficking. According to Warren, the stresses in the twins' lives went away when they moved in with Father. Warren saw no indication of inappropriate conduct by Father and all of the children, including K.J., spoke positively about Father.

Stephanie Pond, the guardian ad litem for Mother, testified she was appointed due to concerns regarding Mother's mental health. Pond described Mother as volatile and prone to strong reactions if she believed her children were not being protected. Mother had a "one-track mind"

focused on her belief in a conspiracy among people she knew to sexually abuse her children. Mother did not believe reports that sexual abuse had been ruled out.

Dr. Myrna Dartson performed a psychological evaluation on Mother. In her report, Dartson stated Mother had both suicidal and homicidal ideations. The homicidal thoughts involved her brother about whom Mother had paranoid and persecutory delusions. Mother said her history of mental illness began when she was young and Dartson thought the onset resulted from family issues and abuse. Mother discussed her criminal history with Dartson including having served time in jail for stabbing her cousin and her dependence on marijuana and her use of it around the children. Dartson recommended the children remain in the care of others indefinitely because Mother posed "a threat to the safety of her children as a result of her mental health issues, difficulties with anger-control, and drug use."

Father told the jury the twins were originally placed in foster care because he did not have a place they could stay. He was eventually able to lease an apartment with his fiancé that satisfied CPS requirements and the children were placed with him in September 2017. Father was employed as a driver with Kellogg's making about $18 an hour. He said both children were happy and healthy living with him.

Father conceded he had a criminal history, the most recent a 2001 probation for possession of a controlled substance. Father said he had difficulty renting an apartment because he and a former girlfriend had been evicted from a previous apartment. He denied acting inappropriately with the children and said he was not involved in any type of abuse. He was currently in a stable relationship and job.

Father began witnessing Mother's delusions in 2009 when she became violent and yelled that God had told her to do it. In 2005, Mother struck him in the face while he was holding the twins. He called the police and they had to restrain her when she resisted arrest. He said despite

all that had happened, the twins loved their mother dearly. When they became upset about her behavior, Father said he would discuss her mental illness with them. He did not want Mother's parental rights terminated, but he wanted sole possession of the children so he could protect them. He was planning to have the twins visit with Mother at a supervised facility.

In the charge, the jury was asked as to each twin whether Mother or Father should be appointed as sole managing conservator. The jury answered Father for each child. The trial court rendered judgment in accordance with the jury's verdict. In the judgment, the court stated it found by clear and convincing evidence that appointment of Mother as managing conservator was not in the best interest of the children because the appointment would significantly impair the children's physical health or emotional development. The court further found that appointing Father as sole managing conservator and Mother as possessory conservator was in the best interests of the children. Mother appeals from this judgment contending the evidence is legally and factually insufficient to support appointment of Father as the sole managing conservator.

The burden of proof in the trial court on the issue of conservatorship is a preponderance of the evidence. *See In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). The jury's findings on the appointment of a sole managing conservator and a possessory conservator are binding upon the trial court. TEX. FAM. CODE ANN. § 105.002(c). We review conservatorship decisions for an abuse of discretion and reverse only if we determine the decision was arbitrary or unreasonable. *Id*. Under an abuse of discretion standard, legal and factual sufficiency challenges to the evidence are not independent grounds of error, but are relevant factors in assessing whether the trial court abused its discretion. *See Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied).

Under section 153.131 of the Texas Family Code, a parent must be appointed sole managing conservator or both parents must be appointed joint managing conservators unless the

court finds the appointment would significantly impair the child's physical health or emotional development. TEX. FAM. CODE ANN. § 153.131(a). It is a rebuttable presumption that appointment of the child's parents as joint managing conservators is in the best interest of the child. *Id.* §153.131(b). A finding of a history of family violence removes this presumption. *Id.*

Mother's sole argument on appeal is that "no evidence was presented to establish that the appointment of Mother as managing conservator would significantly impair the child's physical health or emotional development" or that there was "a history of family violence involving the parents." Even assuming the record is insufficient to show a history of family violence, we conclude the record contains ample evidence to rebut the presumption that appointment of Mother as managing conservator was in the best interest of the children and to support the trial court's finding that appointing Mother as a managing conservator would significantly impair the children's physical health or emotional development.

As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. *See In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Furthermore, a parent's mental state may be considered in determining whether a child is endangered if that mental state allows the parent to engage in conduct that is detrimental to the child's physical and emotional well-being. *See In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

In this case, the record is replete with testimony that Mother is mentally unstable and her conduct had, and would continue to have, a significant detrimental effect on her children. Mother's delusions of sexual abuse, despite evidence that no abuse occurred, and her subjecting the children to repeated medical examinations was highly upsetting to them to the point that they were placed on a suicide watch. Mother had a history of mental illness and criminal violence including suicidal and homicidal ideations, yet she provided no evidence of any consistent treatment. Mother

admitted using illegal drugs when around the children, but refused to submit to court ordered drug testing. While this case was pending, Mother did not participate in most of the services offered to her by CPS, including counseling and parenting classes, and she was inconsistent with respect to visitation. The psychologist who examined Mother concluded she should not have custody of her children because she was a threat to their safety as a result of her mental health issues, difficulties with anger-control, and drug use.

In comparison, Father presented evidence of providing the twins with a stable, loving home. Witnesses testified Father had a caring and supportive relationship with the children and their emotional well-being had significantly improved while they were under his care. Father stated he would make sure Mother continued to be present in the twins' lives, but in a supervised capacity.

A trial court is given wide latitude in determining the best interests of minor children. *Gillespie v.* Gillespie, 644 S.W.2d 449, 451 (Tex. 1982). After reviewing the record as a whole, we conclude the trial court did not abuse its discretion in naming Father sole managing conservator of S.H. and S.H.

We affirm the trial court's judgment.


/Molly Francis/
MOLLY FRANCIS
JUSTICE


180733F.P05



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

IN THE INTEREST OF S.H AND S.H., MINOR CHILDREN

No. 05-18-00733-CV

On Appeal from the 303rd Judicial District Court, Dallas County, Texas
Trial Court Cause No. 14-23164-V.
Opinion delivered by Justice Francis. Justices Fillmore and Whitehill participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered November 16, 2018.