

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-23-00838-CV

**IN THE INTEREST OF O.L.P.**, a Child

From the 285th Judicial District Court, Bexar County, Texas
Trial Court No. 2021-CI-14945
Honorable Antonia Arteaga, Judge Presiding

Opinion by:     Adrian A. Spears II, Justice

Sitting:     Rebeca C. Martinez, Chief Justice
            Adrian A. Spears II, Justice
            H. Todd McCray, Justice

Delivered and Filed: May 21, 2025

AFFIRMED

In this appeal from a final decree of divorce, Karen Eich challenges the designation of her ex-husband, Evan Porras, as the parent with the exclusive right to designate the primary residence of their child, O.L.P. We affirm.

## BACKGROUND

Karen—a German citizen—and Evan—a United States citizen—met while Evan was enlisted in the United States Army and stationed in Germany. They married on December 20, 2018. In April 2019, pursuant to military orders, Evan left Germany and returned to the United States—specifically, San Antonio, Texas—while Karen remained in Germany. In June 2019,

Karen gave birth to O.L.P. When O.L.P. was four months old, Karen and O.L.P. joined Evan in Texas, where the family lived together in an apartment in a community near San Antonio.

By early 2021, Karen and Evan were having marital problems. In March 2021, Karen and O.L.P. traveled to Germany to attend her sister's wedding and to obtain O.L.P.'s birth certificate. Even though their marriage was unraveling, both Evan and Karen anticipated that Karen and O.L.P. would return to Texas after the trip. However, while Karen was in Germany, Evan told Karen the marriage was over, and Karen decided she and O.L.P. would not return to Texas. Evan initially acquiesced to Karen and O.L.P. remaining in Germany; however, he soon changed his mind and asked Karen to bring O.L.P. back to Texas. Karen refused.

In July 2021, Evan sued Karen for child abduction under the Hague Convention.[1] Evan traveled to Germany for the Hague proceedings. The Hague proceedings were resolved when Evan and Karen reached an agreement for Karen and O.L.P. to return to Texas. Days after Karen and O.L.P. returned to Texas, Evan filed a petition for divorce. Karen answered and counter-petitioned for divorce.

On September 13, 2021, Karen returned to Germany, leaving O.L.P. with Evan in Texas.

On December 29, 2021, Karen and Evan reached an agreement for temporary orders in the divorce proceeding. The trial court approved the agreed temporary orders, which appointed Karen and Evan temporary joint managing conservators of O.L.P. and called for Karen, who was still living in Germany, and Evan, who was still living in Texas, to alternate custody of O.L.P. every three months.

---

[1]The Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980, establishes legal rights and procedures for the prompt return of children who have been wrongfully removed or retained. 22 U.S.C. § 9001(a)(4).

1. **Trial**

On November 15 and 16, 2022, the trial court held a two-day bench trial. The main issue was which parent should have the exclusive right to determine O.L.P.'s primary residence. Earlier in the case, the trial court had ordered a child-custody evaluation, which was performed by Dr. Richard R. Theis. Dr. Theis's written evaluation was admitted into evidence at trial. In his written evaluation, Dr. Theis found that both Karen and Evan were fit to parent O.L.P. and that both parents could provide O.L.P. more than adequate housing, educational opportunities, and extracurricular opportunities; however, he ultimately found that Karen engaged in "more informed parenting," had "a relatively better ability to meet the child's emotional needs," and provided "a very nurturing and supportive environment." Dr. Theis recommended that the trial court designate Karen the parent with the exclusive right to determine O.L.P.'s residence, which meant that O.L.P.'s primary residence would be in Germany.

*a. Evan's Testimony*

At trial, Evan testified about the reasons he should be designated the parent with the exclusive right to determine O.L.P.'s residence. Evan had bought a house and "built up a life" for O.L.P. in San Antonio. He said that his plan was to stay in the military, and he would be eligible to retire in ten years. Evan added that he had served in the United States Army for nine years, during which he had been stationed both in the United States and Europe. He was now a surgical technician at Brooke Army Medical Center in San Antonio, Texas. Evan said he did not know if the Army would permit him to return to Germany because in 2021, he had "re-enlisted to stabilize in San Antonio."

Evan further testified about the pre-school O.L.P. was attending in San Antonio, explaining that it focused on child development. According to Evan, O.L.P. was very smart and she was at

the head of her pre-school class. Evan presented videos and photographs of O.L.P., depicting her life with him in San Antonio. One of the videos showed O.L.P.'s reaction when Evan picked O.L.P. up from pre-school. Another video showed O.L.P.'s reaction when Evan met her at the airport in Germany after she had not seen him for twelve weeks. According to Evan, these videos were especially important because they showed how he and O.L.P. had "a real bond." The photographs Evan presented showed him and O.L.P. in the backyard of their house in San Antonio. Evan said he had made a swing and a trampoline for O.L.P. and had made sure they were as safe as possible for O.L.P. Evan also presented photographs of O.L.P. in her bedroom, where she loved to play. Evan said that their neighborhood was full of kids, and they had a neighborhood park nearby. Other photographs showed Evan and O.L.P. walking to the park, doing arts and crafts together, spending the day at a lake, attending a wedding, and celebrating Easter. Additionally, Evan testified about the people in Texas who played a role in O.L.P.'s life, such as her godfather and her godfather's mother, who was "like [a] grandma" to O.L.P.

Evan also testified that while he and Karen were together, he took O.L.P. to all her medical and dental appointments. When O.L.P. returned from Germany, Evan took her to the doctor for a check-up, where O.L.P.'s failure to gain weight raised "red flags." While she was in Germany with Karen, O.L.P. had dropped on the weight curve from the twenty-fifth percentile to the second percentile. After O.L.P. returned to Texas and lived with Evan for about six weeks, she started gaining weight again, moving up to the sixteenth percentile on the weight curve. Additionally, Evan expressed various concerns about the way Karen cared for O.L.P. while she was in Germany, such as failing to require O.L.P. to wash her hands before eating and failing to dress O.L.P. appropriately for winter weather. Evan also stated that while in Karen's care in Germany, O.L.P. obtained a large contusion on her forehead. Karen claimed O.L.P. had fallen and hit her head.

Furthermore, Evan testified that while in Germany, Karen ran over a boulder and totaled a car. He believed O.L.P. was in the car when the accident happened.

Evan contended that Dr. Theis overlooked many issues related to Karen's mental health. The undisputed evidence showed Karen had been diagnosed with anxiety and depression. Although Dr. Theis said Karen's mental health had been stabilized for years, Evan believed that Karen's behavior indicated otherwise. In late 2020 and early 2021, Karen had sent Evan texts stating that her medication was not working, that she was having "anxiety attacks," and that she could not "feel" her "body." These texts were admitted into evidence. One time, when Evan's mother was visiting them in San Antonio, Karen had one of these "episodes" and Evan's mother had to step in and take care of O.L.P. Evan also testified that Karen had called his work supervisor and told him that Evan was "a drunk" and that he "played" with his gun at home. When Karen and O.L.P. returned to San Antonio in July 2021, Karen called the police and told them that she thought Evan abused O.L.P. because the child had a small, faint bruise on her back. The police responded to the call, but after talking to Evan and Karen they did not take any action.

On cross-examination, Evan admitted that when Karen first told him she and O.L.P. were going to remain in Germany, he sent [Karen] a text saying: "[O.L.P.] will be happier there, too; [she] has more friend[s]; [will] be safer; [she has] her grandpa; [she will be] healthier, too; [and the] schools are better, too. Everything's better for her there so I'll learn to live with it." But, at trial, Evan clarified that he had made these statements in the middle of an argument, and it was the one time he agreed they should stay in Germany "out of the million times [he] told [Karen] to come back." He explained that he said those things because he was "in shock," "completely passive," and "numb at the moment." Evan denied that he actually felt that O.L.P.'s best interest

would be served by her being with Karen in Germany. Evan explained that after he made those statements, he researched his rights as a parent and that changed everything.

### b. Karen's Testimony

Karen testified that she and Evan decided to get married when Karen realized she was pregnant in November 2018. After Evan and Karen were married, they lived together in an apartment in Germany near the military base where Evan was stationed. At the time, Karen was finishing her service in the German military. Karen claimed that she and Evan planned for her to leave the German military so she could move with him to the United States, and they could raise O.L.P. there. Karen also claimed that she and Evan decided that O.L.P. should grow up in Germany and go to school there because they wanted the best possible future for her.

Karen and Evan lived together in Germany until April 2019, when Evan had to return to the United States as ordered by the Army. This meant Evan was not present when O.L.P. was born in Germany in June 2019. Evan did not meet O.L.P. until November 2019, when she and Karen moved to Texas. At the time, O.L.P. was four months old. Once Karen and O.L.P. moved to Texas, Evan went to work every day, and Karen was primarily responsible for O.L.P.'s care. Because Evan worked at a hospital, Evan accompanied Karen to O.L.P.'s medical appointments.

Karen testified that when she and O.L.P visited Germany to attend her sister's wedding in March 2021, she intended to return to the United States. A week after she and O.L.P. arrived in Germany, Karen told Evan she missed him, and he told her that he did not want to be married anymore and that she should stay in Germany. However, a few days later, Evan changed his mind and told Karen that she should bring O.L.P. back to Texas. However, Karen did not return to Texas, remaining in Germany with O.L.P.

In June 2021, Karen started a romantic relationship with Kurt Breu. After they had been dating for about a month, Karen introduced Kurt to O.L.P.

In July 2021, Evan sued Karen for child abduction under the Hague Convention. When Evan came to Germany for the Hague proceedings, Karen did not prevent him from seeing O.L.P. Instead, Karen allowed Evan to stay in her apartment with O.L.P. and she stayed elsewhere. Karen gave Evan unsupervised access to O.L.P. while he was in Germany. Karen and Evan reached an agreement in the Hague proceedings and, in keeping with that agreement, Karen and O.L.P. returned to Texas on July 27, 2021.

When Karen and O.L.P. returned to Texas, things did not go as planned. Karen and Evan had agreed that upon returning to Texas, Karen and O.L.P. would live in Evan's apartment and Evan would live in base housing. When Evan was unable to find base housing, Karen offered to stay with a friend. Evan never allowed Karen to live in his apartment with O.L.P. Next, Evan enrolled O.L.P. in pre-school and, even though they had agreed to attend the orientation together, Evan attended it without Karen. This was concerning for Karen because O.L.P. had never been in pre-school before.

Five days after she returned to Texas, Karen called the police to complain about Evan. The police were dispatched to Evan's apartment, and Karen told them that Evan was abusing O.L.P., pointing to a small, faint bruise on the child's back. Evan, in turn, told the police that Karen was dangerous and that she would "take off" with O.L.P. After Karen called the police, Evan did not allow Karen unsupervised access to O.L.P.

On September 13, 2021, Karen left Texas and returned to Germany. Karen explained that she decided to move back to Germany because she was pregnant with twins, and she needed medical care. Kurt was the father of the twins. Additionally, Karen did not have money, a car, or

an apartment, and she was still staying at a friend's house. Karen claimed that Evan allowed her to see O.L.P. for only one or two hours on the weekend. Karen claimed that if Evan had acted differently when she returned to Texas, she might still be in Texas. But now she was in Germany, and she was not coming back to the United States.

By the time of trial, Karen and Kurt had a newborn baby boy.[2] O.L.P., who was three and half, had seen Karen and Kurt's new baby only once in person. Karen presented photographs of O.L.P. and Kurt, testifying that O.L.P. and Kurt were "very close," and they liked to play instruments together. Karen explained that she and Kurt lived on a farm belonging to Kurt's family. Kurt worked on the family farm. Karen presented photographs of O.L.P and various members of Kurt's family, the house where she and Kurt lived, and O.L.P.'s room in that house. Karen also presented photographs of O.L.P. and her cousins, who live in another town in Germany, and a photograph of O.L.P. and her maternal grandfather, emphasizing that O.L.P. has a very good relationship with him.

Karen described her family—her mother, father, and brother—as a "very tight and loving family" who are close to O.L.P. Karen acknowledged that because she was sharing an apartment with her brother and his wife, she became involved in their problems. Karen had sent Evan text messages about her brother's erratic behavior. Karen also agreed that some of the texts she sent to Evan about her brother's behavior were concerning.[3] However, according to Karen, her brother had engaged in therapy and made positive changes to his life. Her brother had a great job, and he

---

[2]Karen's pregnancy with twins ended with a miscarriage. She became pregnant again in February 2022. Karen and Kurt's son—O.L.P.'s half-brother—was born in October 2022.

[3]In these text messages, Karen said that everyone in her family was terrified of her brother and his erratic behavior, which included "beating" his two little girls and his wife and breaking his hand in a fight at a festival. When O.L.P. was first born, Karen and O.L.P. lived in the same apartment with her brother and his family until Karen's mother kicked him out of the apartment.

and his wife had their own place to live now. Karen added that her brother was not around O.L.P. often, and he was never placed in charge of O.L.P.

As for her employment history and her finances, Karen was in the German military until December 2018, where she was a legal assistant. By the time of trial, Karen was working as a production helper at an art factory, and she had been doing so for almost a year. Karen also testified that she had been on maternity leave since April 2022, and she would continue to be on maternity leave until January 2024. Karen explained that under the Germany maternity leave system she was paid sixty-six percent of her salary plus $250 per child every month. Karen claimed that she was not financially dependent on Kurt.

Karen testified that she should have the exclusive right to determine O.L.P.'s primary residence because she had been O.L.P.'s primary caregiver since she was born, and she has a big family that can provide her with support. Karen added that O.L.P. already went to school in Germany, and she made a general claim that O.L.P. would be safer in Germany. Karen further testified that Evan should not have the exclusive right to determine O.L.P.'s primary residence because Evan was in the military and his workdays were long. With Evan, O.L.P. must wake up at 5:00 a.m. and remain in daycare for over ten hours. On the other hand, Karen was able to spend part of the day caring for O.L.P. because Karen only worked part-time. Karen acknowledged that Evan loves O.L.P. However, Karen feared that because Evan was very strict with her, Evan would also be very strict with O.L.P.

On cross-examination, Karen testified that she and Kurt had been living together for only four months. Before living with Kurt, Karen had lived in a little apartment on Kurt's sister's property. Karen acknowledged that Evan had to leave Germany and return to the United States before O.L.S. was born because he was changing his career and he had orders to return to the

United States to begin training on May 10, 2019. Karen further confirmed that she had permanent resident status in the United States, but said she could not live in the United States because she was in a relationship with Kurt, who was the father of her new baby, and Kurt could not leave Germany because of his family's farm. Karen also testified that she would have to return her green card upon getting divorced from Evan.

After hearing all the evidence, the trial court appointed Karen and Evan as O.L.P.'s joint managing conservators, designated Evan as the conservator with the exclusive right to designate O.L.P.'s primary residence without regard to geographic location, and ordered Karen to have possession and access to O.L.P. under a standard possession order.[4] The trial court also designated Karen as the conservator with the exclusive right to designate O.L.P.'s primary residence if Evan received military orders for military deployment, military mobilization, or temporary military duty exceeding twenty-one days.

### 2. Hearing on Motion to Reconsider

Karen subsequently filed a motion for reconsideration. At the beginning of the hearing on the motion, the trial court stated:

> [At trial,] [t]he question that I asked both parents is[,] you both understand that neither of you are going to have the kind of relationship with your child that you want unless you both at least live in the same country. And I asked both of you at that time why you had not done that. And you were both adamant – or you had taken affirmative steps indicating that [living in the same country] was not an option for you, i.e., Mr. Porras staying here in his current position with the military, not taking steps to request a relocation to Germany, also, buying a home and trying to lay even deeper roots in San Antonio. And, Ms. Eich, same thing, returning to Germany, being involved with her current partner, getting pregnant again and taking those steps to even move in with her partner's family on her partner's property – or his family's property. And neither one having any inkling at all that they need to move to the other's country.

---

[4]The trial court further ordered that if Karen relocated to Bexar County, Texas, within thirty minutes of O.L.P.'s school before December 31, 2023, Karen and Evan "shall have an equal possession and access schedule" and the "standard possession order shall be null and void."

So the decision was not one I took lightly but one that I believe was best for [O.L.P.]. . . . [I]t was clear to me that father has a stable residence here in town; father has a strong bond with daughter; and father will continue to be able to provide stability for the child and that is his sole focus.

And, though, Ms. Eich, I believe that you are a . . . great mother, I have concerns about your employment history, I have concerns about you keeping the child away from Dad and I have concerns about the stability should this relationship that you're currently in not work out, and maybe it will. Maybe . . . you'll be together forever. I don't know. I just know that with everything – when I considered everything this was the conclusion that I felt was best for the child at that time.

Karen then presented additional evidence in support of her motion for reconsideration. Dr. Theis, who conducted the custody evaluation, testified that he visited Evan at his house in San Antonio and Karen at her residence in Germany. Dr. Theis did not believe that either Evan or Karen was going to neglect or abuse O.L.P. And, even though Karen suffered from some depression and anxiety, he did not believe that Karen had significant mental health or substance abuse problems. Dr. Theis found that Karen was in a stable, loving, nurturing relationship and that her residence in Germany was stable. He also found that O.L.P. had a loving relationship with her maternal grandparents, aunts, uncles, and cousins in Germany. Dr. Theis testified that co-parenting was not a "primary issue" in this case because the parents lived in different countries they were not going to have to co-parent much. He also testified that when O.L.P. stayed with Evan she went to pre-school from early in the morning until about 3:30 in the afternoon. Dr. Theis stated that psychological testing indicated that Evan has "an extremely high level of self-confidence" and does not see that he has any problems. Dr. Theis noted that Evan never acknowledged that he contributed to the difficulties in his relationship with Karen. Dr. Theis also stated that psychological testing indicated that Karen "avoids conflict, is dependent, [and] has dependent tendencies in her relationships."

Karen testified that she learned she was pregnant with twins about a week after she and O.L.P. returned to Texas in July 2021. Karen explained that she did not want to leave O.L.P. in Texas and go back to Germany in September 2021, but she did not have a choice. In Texas, Karen did not have access to medical care, and she did not have a place to live. Plus, Karen was only able to see O.L.P. on the weekends. Karen believed it was unfair to say that the reason she left Texas and returned to Germany was to be with Kurt. Finally, Karen testified she was a hair stylist, and she had just secured a job in a new salon, where she worked part-time.

After hearing testimony from Dr. Theis and Karen, the trial court denied the motion for reconsideration, stating, "I just know that with all the information, all the testimony, all the evidence that I received, at this time I believe that the ruling I painfully made back when you were here before . . . is still the right ruling."

Karen appealed.

## DISCUSSION

### A. Applicable Law

When parents are appointed joint managing conservators, the trial court must designate the parent "who has the exclusive right to determine the primary residence of the child," either with or without geographic limitations. TEX. FAM. CODE § 153.134(b)(1). The Texas Family Code provides that in matters involving conservatorship and possession of and access to the child, the primary consideration is the best interest of the child. TEX. FAM. CODE § 153.002.

In determining the best interest of a child, courts evaluate the evidence using the non-exclusive factors enumerated in *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These non-exclusive factors include: the child's desires, the child's current and future physical and emotional needs, the current and future emotional and physical danger to the child, the parental

abilities of the persons seeking custody, the programs available to assist those persons seeking custody to promote the best interest of the child, the plans for the child by the individuals or agency seeking custody, the stability of the home or proposed placement, the acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate, and any excuse for the parent's acts or omissions. *Id.*[5]

Additionally, section 153.001 of the Texas Family Code provides that it is the public policy of Texas to: (1) assure that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child; (2) provide a safe, stable, and nonviolent environment for the child; and (3) encourage parents to share in the rights and duties of raising their child after the parents have separated or dissolved their marriage. *See* TEX. FAM. CODE § 153.001(a)(1)-(3).

**B. Standard of Review**

Trial courts have wide latitude in determining a child's best interest, and their judgments will only be reversed on appeal for an abuse of discretion. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) ("Conservatorship determinations . . . are subject to review only for abuse of discretion, and may be reversed only if the decision is arbitrary and unreasonable."). "A trial court's determination of what is in the child's

---

[5]Karen urges us to apply both the *Holley* factors and the *Lenz* factors in evaluating O.L.P.'s best interest. The *Lenz* factors include: (1) the reasons for and against the move; (2) the effect on extended family relationships; (3) the effect on visitation and communication with the non-custodial parent to maintain a full and continuous relationship with the child; (4) the possibility of a visitation schedule allowing the continuation of a meaningful relationship between the non-custodial parent and child; and (5) the nature of the child's existing contact with both parents, and the child's age, community ties, and health and educational needs. *In re M.U.C.O.*, No. 04-21-00280-CV, 2022 WL 3638255, at *3 (Tex. App.—San Antonio Aug. 24, 2022, no pet.) (citing *Lenz v. Lenz*, 79 S.W.3d 10, 15–16 (Tex. 2002)). Courts apply the *Lenz* factors in cases involving the imposition or modification of a geographic residency restriction. *See id.*; *In re M.T.*, No. 04-19-00589-CV, 2020 WL 4808708, at *3–4 (Tex. App.—San Antonio Aug. 19, 2020, no pet.). Although here the trial court did not order a geographic residency restriction, we nevertheless consider some of the *Lenz* factors because they are pertinent to our analysis and the *Holley* factors are non-exclusive.

best interest, specifically the establishment of terms and conditions of conservatorship, is a discretionary function." *In re J.J.R.S.*, 627 S.W.3d 211, 218 (Tex. 2021). "In determining which conservator will have the exclusive right to establish primary residence under section 153.134(b), the trial court is vested with broad discretion." *Billisits v. Billisits*, No. 03-21-00358-CV, 2023 WL 2191330, at *5 (Tex. App.—Austin Feb. 24, 2023, no pet.). Accordingly, the trial court's judgment will be reversed only when it appears from the record as a whole that the court has abused its discretion. *In re J.J.R.S.*, 627 S.W.3d at 218.

A trial court abuses its discretion when it acts arbitrarily or unreasonably. *Gardner v. Gardner*, 229 S.W.3d 747, 751 (Tex. App.—San Antonio 2007, no pet.). In determining if the trial court abused its discretion, legal and factual sufficiency of the evidence are not independent grounds of error; instead, they are simply factors we consider in assessing whether the trial court abused its discretion. *Id*. We engage in a two-pronged inquiry: (1) whether the trial court had sufficient information on which to exercise its discretion, and (2) whether the trial court erred in applying its discretion. *Id*. "The traditional sufficiency review comes into play with regard to the first question; however, the inquiry does not end there." *Zeifman v. Michels*, 212 S.W.3d 582, 588 (Tex. App.—Austin 2006, pet. denied). We then determine whether, based on the evidence, the trial court made a reasonable decision—a decision that was neither arbitrary nor unreasonable. *Id*. A trial court does not abuse its discretion as long as some evidence of a probative nature exists to support its decision, and no abuse of discretion occurs when the trial court bases its decision on conflicting evidence. *Billisits*, 2023 WL 2191330, at *2; *Zeifman*, 212 S.W.3d at 587.

In a bench trial, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005); *Gardner*, 229 S.W.3d at 753. A reviewing court cannot substitute its judgment for that of the fact

finder. *City of Keller*, 168 S.W.3d at 822. Because conservatorship determinations are intensely fact driven, the trial court is in the best position to observe the demeanor and personalities of the witnesses and can "feel" the forces, powers, and influences that cannot be discerned by merely reading the record. *In re J.J.R.S.*, 627 S.W.3d at 218. "Appellate courts routinely defer to the fact finder at trial concerning matters of credibility and demeanor, but perhaps in no other type of litigation is it more critical." *In re De La Pena*, 999 S.W.2d 521, 529 (Tex. App.—El Paso 1999, no pet.). "The individuals vying for conservatorship may be scrutinized by the fact finder for such intangible signs as an animated smile when describing a child's achievements, a furrowed brow when explaining typical affectionate concern, or even tears when anticipating the emotional impact the outcome of litigation will have on a child." *Id.*

When, as here, no findings of fact or conclusions of law were made, we presume the trial court made all fact findings necessary to support its judgment.[6] *In re M.U.C.O.*, No. 04-21-00280-CV, 2022 WL 3638255, at *3 (Tex. App.—San Antonio Aug. 24, 2022, no pet.). We uphold the implied findings if they are supported by the record and correct under any theory of law applicable to the case. *Id.* In deciding whether some record evidence supports an implied finding, "it is proper to consider only that evidence most favorable to the issue and to disregard entirely that which is opposed to it or contradictory in its nature." *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990).

## C. Application

Under the applicable standard of review, we first review the entire record to determine if the trial court had sufficient evidence upon which to exercise its discretion. *Zeifman*, 212 S.W.3d

---

[6]The clerk's record shows Karen filed a timely "Request for Findings of Fact and Conclusions of Law," but she did not file a "Notice of Past Due Findings of Fact and Conclusions of Law" as required. *See* TEX. R. CIV. P. 297. A party who fails to file a notice of past-due findings of fact waives the right to complain about the trial court's failure to make findings of fact. *See AD Villarai, LLC v. Chan II Pak*, 519 S.W.3d 132, 137 (Tex. 2017); *Franks v. Zwicke*, No. 04-12-00529-CV, 2013 WL 1642722, at *5 (Tex. App.—San Antonio Apr. 17, 2013, no pet.).

at 588; *Gardner*, 229 S.W.3d at 751. After reviewing the entire record in this case, we conclude the trial court had sufficient evidence before it to exercise its discretion. *See Zeifman*, 212 S.W.3d at 588; *Gardner*, 229 S.W.3d at 751. We next determine if the trial court erred in applying its discretion. *Zeifman*, 212 S.W.3d at 588; *Gardner*, 229 S.W.3d at 751.

As a preliminary matter, we reject Karen's argument that the trial court abused its discretion by not following the recommendations of the child custody evaluator, Dr. Theis. "The trial court is not required to accept and follow a child custody evaluator's custody recommendation, especially when the evidence supports a custody determination that is contrary to that of the evaluator's recommendation." *Scott v. Scott*, No. 14-21-00077-CV, 2022 WL 4553336, at *10 (Tex. App.—Houston [14th Dist.] Sept. 29, 2022, no pet.); *In re K.K.R.*, No. 04-18-00250-CV, 2019 WL 451761, at *5 (Tex. App.—San Antonio Feb. 6, 2019, no pet.). As discussed below, ample evidence existed to support a determination contrary to Dr. Theis's recommendation.

Karen also argues the trial court abused its discretion because she was O.L.P.'s "sole provider since birth," and she has a support system of extended family that can help her raise O.L.P. Although Karen was O.L.P.'s primary caregiver during her infancy, Evan's caregiving role expanded as O.L.P. became a toddler. When Karen left O.L.P. in Texas and returned to Germany on September 13, 2021, Evan became the child's primary caregiver, handling all of O.L.P.'s physical and emotional needs. Once the temporary orders were in place, Evan took care of all of O.L.P.'s physical and emotional needs during the three-month periods that he had temporary custody of O.L.P. Overall, the evidence showed that O.L.P. and Evan engaged in routine and recreational activities together and that they had a strong parent-child bond.

Karen further argues that the trial court abused its discretion because Evan did not have an adequate support system in Texas. Karen emphasizes that she has many extended family members in Germany to provide her with a support system. However, the trial court could have determined that Evan also had a support system. The evidence showed not only that Evan and O.L.P. were close to her godfather and her godfather's family, but also that they socialized and recreated with other friends and neighbors. Additionally, the trial court could have determined that Karen's support system in Germany was not as strong or as positive as Karen represented. The evidence included text messages from Karen to Evan complaining about the lack of support her mother provided her and complaining about her brother and the way he mistreated his children and his wife.

Karen next argues the trial court abused its discretion because Evan is "subject to the dictates of military life" and "can get deployed or reassigned anywhere in the world." However, the evidence showed that Evan had "stabilized" in his job in San Antonio and was planning on remaining in this position for the long term. Evan had purchased a home in San Antonio. Plus, the divorce decree expressly provided that in the event Evan was deployed for a period exceeding twenty-one days, Karen would have the exclusive right to designate O.L.P.'s primary residence. In a related argument, Karen contends the trial court abused its discretion because Evan works long hours and O.L.P. spends the entire day in childcare. However, there was also evidence showing that Evan finished his work at about 3:30 in the afternoon. Additionally, evidence was presented showing that O.L.P.'s pre-school was a positive environment in which O.L.P. was thriving.

Karen further argues the trial court abused its discretion by "dismissing" evidence showing that she did not keep O.L.P. away from Evan. In support of this argument, Karen cites to evidence

that Evan and Karen purchased one-way tickets for Karen and O.L.P.'s trip to Germany, and that about a week after they were in Germany, Evan told Karen that he did not want a relationship with her anymore, and she and O.L.P. should stay in Germany. However, the evidence also showed that one-way tickets were purchased because Karen and Evan did not know how long it would take to obtain O.L.P.'s birth certificate. Additionally, the evidence showed that when Karen and O.L.P. left for Germany in March 2021, both Evan and Karen were expecting Karen and O.L.P. to return to Texas. Furthermore, the evidence showed that soon after telling Karen to stay in Germany, Evan changed his mind and told Karen that she and O.L.P. should return to Texas. Nevertheless, Karen and O.L.P. remained in Germany for about four months and they did not return to Texas until Karen and Evan reached an agreement in the Hague proceedings in late July 2021. Because there was some evidence to support trial court's implied finding that Karen kept O.L.P. away from Evan, the trial court did not abuse its discretion.

Karen next argues the trial court abused its discretion because the evidence established that Evan was unable to "co-parent" with her. In support of this argument, she points to evidence of Evan's conduct when she returned to San Antonio after the Hague proceedings, such as Evan's failure to allow her to live in his apartment, failure to renew Karen's military identification, and failure to help her settle into San Antonio life. But this evidence does not necessarily show an inability to make joint decisions about matters involving O.L.P. Even though Dr. Theis opined that Evan was unable to co-parent, he also testified that because Karen and Evan lived in different countries not much co-parenting was going to take place. The trial court could have determined that the issue of co-parenting was not determinative of the issue of O.L.P.'s primary residence.

Karen also argues the trial court abused its discretion by "mischaracterizing" her employment history and her relationship with her new partner, Kurt. Karen argues that these

aspects of her life demonstrate that she can provide O.L.P. with stability. However, during trial, Karen testified that she was employed as a production helper at an art factory for almost a year. About five weeks later, at the motion for reconsideration hearing, Karen testified that she had just obtained a new job at a salon where she was employed as a stylist. Additionally, Karen testified that by the time of trial she and Kurt had been living together for only four months. Based on this evidence, the trial court could have determined that neither Karen's employment, nor her relationship with Kurt was consistent or stable.

Karen further argues the trial court abused its discretion because it was in O.L.P.'s best interest to be raised in close proximity to her extended family members in Germany. Although there was undisputed evidence that O.L.P. had a strong relationship with her grandparents and other extended family members in Germany, the trial court could have properly determined that these relationships could continue to develop when O.L.P. was in Germany with Karen and through other interactions, such as phone calls and video conferences.

Karen also argues the trial court abused its discretion because its decision separates O.L.P. from her half-brother, whose parents are Karen and Kurt. In support of this argument, Karen relies on a case in which the El Paso court of appeals provided that full-blooded "[s]iblings are not to be separated except upon a showing of clear and compelling reasons." *De La Pena*, 999 S.W.2d at 535. Unlike the El Paso court of appeals, this court has recognized that the Texas Family Code does not require a showing of clear and compelling reasons for siblings to be separated during periods of possession. *Gardner*, 229 S.W.3d at 754. Instead, we have held that in such situations "the trial court's primary consideration in deciding the issue of possession is the best interest of the child." *Id*. Here, the trial court did not abuse its discretion by separating O.L.P. from her half-

brother because they do not have the same parents. Additionally, the trial court could have otherwise determined that separating O.L.P. from her half-brother was in O.L.P.'s best interest.

Finally, to the extent Karen argues the trial court abused its discretion because Evan engaged in "systematic lying" about her, we must reject her argument. As the fact finder, the trial court was the sole judge of the credibility of the witnesses and the weight to be given their testimony, and we cannot substitute our judgment for that of the fact finder. *See City of Keller*, 168 S.W.3d at 819, 822.

Because the trial court did not make formal findings of fact and conclusions of law, we must presume that the trial court made all fact findings necessary to support its judgment. *See In re M.U.C.O.*, 2022 WL 3538255, at \*3. Here, the evidence supports implied findings that Evan was the conservator better able to meet O.L.P.'s current and future physical and emotional needs, and that Evan was the conservator better able to provide O.L.P. with safety and stability. "As in any custody case, there are often no perfect solutions when parties divorce or separate, and the trial court here was tasked with making a difficult decision that will have an impact on [the parents and the child] and their extended families." *Billisits*, 2023 WL 2191330, at \*5. After reviewing the record as a whole, we conclude the trial court acted reasonably and properly applied its discretion by designating Evan the conservator with the exclusive right to determine O.L.P.'s primary residence. *See In re J.J.R.S.*, 627 S.W.3d at 218; *Gardner*, 229 S.W.3d at 753-54.

## CONCLUSION

The trial court's judgment is affirmed.

Adrian A. Spears II, Justice