# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-24-00114-CV

**Roberto Duarte-Hernandez, Appellant**

**v.**

**Ananda Rodriguez, Appellee**

### FROM THE 455TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-22-002914, THE HONORABLE MADELEINE CONNOR, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Roberto Duarte-Hernandez appeals from the trial court's final divorce decree ending his marriage with Ananda Rodriguez. On appeal Duarte-Hernandez challenges the trial court's division of community property and award to Rodriguez of spousal support. For the following reasons, we affirm the decree.

## BACKGROUND

The parties were married March 3, 2003, in Mexico and have three children of the marriage, one of whom was an adult at the time of the bench trial. The other children were twelve and four at the time of trial, and the four-year-old has a rare genetic abnormality called Kabuki syndrome.[1]

---

[1] Evidence admitted at trial included a genetic test report for the child showing a "pathogenic variant in the KMT2D gene, which is consistent with the diagnosis of Kabuki syndrome." The report indicated that the syndrome is often characterized by "distinctive facial

Rodriguez filed for divorce April 19, 2022. In her live petition, Rodriguez alleged as grounds that the marriage had become insupportable and that Duarte-Hernandez had committed acts of cruelty towards her. She sought appointment as the children's sole managing conservator and child support, including continuing support for the parties' disabled child beyond her eighteenth birthday. In seeking a just and right division of the marital estate, Rodriguez pleaded that the court have due regard for actual and constructive fraud on the community estate allegedly committed by Duarte-Hernandez; specifically, she pleaded that he borrowed $12,000 "without explanation of accountability" and diverted community funds that should have paid down mortgages on prior marital homes to purchase a house in Mexico that he later transferred to his mother for $20,000, which she claims caused the couple to lose their prior homes to foreclosure. She petitioned the court to "calculate the value by which the community estate was depleted" due to Duarte-Hernandez's fraud on the community, "calculate the amount of the reconstituted estate . . . that would exist if an actual or constructive fraud on the community had not occurred," and "divide the value of the reconstituted estate between the parties" in a just and right manner.

Rodriguez further alleged that Duarte-Hernandez failed to disclose in his interrogatory responses that he and his brother purchased a 13.84-acre tract of land (the County Line Property) during the marriage and a 16x68-foot mobile home they placed on the land in January 2019. She alleged that, besides his job as a chef, Duarte-Rodriguez has another source of income—selling "fighting roosters for $500.00 each"—but has never accounted to her how

---

features, persistence of fetal fingertip pads, postnatal growth retardation, skeletal defects, and mild to moderate intellectual disability."

much income he has received therefrom. Finally, Rodriguez petitioned for spousal support and attorney's fees.

Duarte-Hernandez counter-petitioned, alleging that Rodriguez was guilty of cruel treatment towards him and that the marriage had become insupportable. He alleged that Rodriguez had committed breach of fiduciary duty, waste, and constructive fraud by withdrawing funds from community accounts after filing for divorce in a total amount of $17,374—in violation of the court's standing order—and by withdrawing $4,800 from a joint account without his knowledge shortly before filing suit. He sought to be appointed temporary joint managing conservator of the children with the exclusive right to designate the children's primary residence. As Rodriguez did, Duarte-Hernandez petitioned the court to calculate and determine the amount of the reconstituted marital estate due to Rodriguez's alleged fraud and to divide the reconstituted estate in a just and right manner. He likewise sought attorney's fees.

Trial to the court occurred April 17–18, 2023. The trial court signed a final divorce decree on November 21, 2023. The decree appointed the parties joint managing conservators of the minor children and granted Rodriguez the exclusive right to designate their primary residence. It ordered Duarte-Hernandez to pay Rodriguez monthly child support of $827.25 and monthly spousal maintenance of $500.00.[2] Regarding property division, the decree awarded to Rodriguez the following: the land on which the marital mobile home is situated and all other mobile homes thereon (the Lucinda Drive Property); a 2017 Nissan Pathfinder; a sole proprietorship known as Makeup and Hair by Ananda (including its goodwill, receivables, equipment, and inventory); and all household tangible property, personal effects, and cash or

---

[2] The spousal maintenance was ordered to last until the earliest of the following: October 25, 2036; the death of either party; the remarriage of Rodriguez; or further court orders affecting spousal maintenance, including cohabitation by Rodriguez.

financial accounts in her possession or subject to her sole control. The decree awarded to Duarte-Hernandez the following: a 2020 Chevy Silverado; an undivided 50% interest in the County Line Property and the mobile home thereon; and all household tangible property, personal effects, and cash or financial accounts in his possession or subject to his sole control. The decree assigned to Duarte-Hernandez the debt on the Silverado and an unpaid property-tax balance owed to Travis County of $4,458.19 for the 2022 taxes on the Lucinda Drive Property. It also confirmed as Duarte-Hernandez's separate property "any and all interest by inheritance for the property located in [the State of] Guerrero, Mexico under Juan Hernandez Bartolo" (the Inheritance Property).[3]

Duarte-Hernandez timely filed a motion for new trial in which he asserted that the trial court abused its discretion in making an unjust property division. He argued that it was "undisputed at trial that the marital residence [the Lucinda Drive Property] . . . was valued at $210,547" and that the "50% undivided interest in the real property co-owned with [his] brother [the County Line Property] . . . was valued at $89,011 with a community portion at $44,506." He argued that the trial court's award of the Lucinda Drive Property to Rodriguez and the 50% undivided interest in the County Line Property to him—plus assigning to him the 2022 property-tax debt—resulted in an unjust split of 77.92% in Rodriguez's favor and 22.08% in his favor. The motion for new trial was overruled by operation of law. Neither party requested findings of fact and conclusions of law, and the trial court did not make any. Duarte-Hernandez timely perfected this appeal.

---

[3] Rodriguez did not file a notice of appeal and thus does not challenge the trial court's characterization of the Inheritance Property as Duarte-Hernandez's separate property. Juan Hernandez Bartolo is Duarte-Hernandez's maternal uncle.

4

In addition to Rodriguez and Duarte-Hernandez, the following witnesses testified at trial: Sheila Cates, a realtor; Kevin Rodriguez (Kevin), the parties' adult son; Marco Duarte-Hernandez (Marco), Duarte-Hernandez's brother, who owns the other 50% undivided interest in the County Line Property; and Dioselina Oriostegui Castaneda, Marco's wife.

### *Rodriguez's testimony*

Rodriguez testified that the parties previously lived in Illinois and then Indiana after moving to the United States from Mexico in 2013. In each of those states, the parties owned a home with a mortgage, but at some point Duarte-Hernandez stopped paying the respective mortgages, telling Rodriguez that he was saving the money to purchase property in Mexico. Despite the parties not making mortgage payments on those two prior homes—monthly amounts of $1,500 and $1,200, respectively—they were able to continue living in the homes for a period, specifically in the Indiana home for two or three more years, after which time the homes were foreclosed upon. Rodriguez explained that Duarte-Hernandez used the money he had saved to purchase "the house in Mexico."[4] The Mexico house was "very simple" and small, "just a one-story," but Rodriguez explained that over the years, Duarte-Hernandez made improvements to it against her wishes, using community funds, including adding a second story.[5]

---

[4] It is not clear from the record whether this "house in Mexico" is the same as the Inheritance Property awarded to Duarte-Hernandez as his separate property. As explained infra, the two documents admitted into evidence related to Mexican real estate identify parcels with distinct metes and bounds, indicating that the documents may be referencing two distinct real properties.

[5] A photo of the improved house was admitted into evidence.

Rodriguez testified that Duarte-Hernandez never informed her how much he spent on making the improvements or what his salary was.

The trial court admitted into evidence Rodriguez's interrogatory responses. Therein, she explained that "everything [is] on the 2nd floor" of the Mexico house and that Duarte-Hernandez had given her a "price" for the house of "2–3 million pesos" and had told her he "was not going to sell" it but then later sold it to his mother for 20,000 pesos.[6] The trial court admitted into evidence a document proffered by Rodriguez—a "Private Purchase and Sale Contract"—that Rodriguez explained evidenced Duarte-Hernandez's sale of the Mexico house to his mother on January 5, 2022, for 20,000 pesos.[7] The contract recited that Duarte-Hernandez had originally purchased the property from his mother on June 14, 2016, "by means of a purchase-sale contract," but does not indicate the purchase price.

There are three rental mobile homes on the Lucinda Drive Property, including the RV in which Duarte-Hernandez was residing at the time of trial, plus the marital mobile home in which Rodriguez and the children live. Before Rodriguez filed for divorce, she explained, Duarte-Hernandez had never informed her of the rental receipts for those units or provided her with any of the proceeds. Rodriguez testified the Duarte-Hernandez had filed an income-tax

[6] No evidence in the record reflects the value of 20,000 pesos in U.S. dollars at the time of trial, but in opening statements, Rodriguez's attorney represented that the amount was roughly $800, which would make 2–3 million pesos worth between $80,000–$146,000 at the time. Such estimates are consistent with publicly available historical currency-exchange data. *See, e.g.*, https://fiscaldata.treasury.gov/datasets/treasury-reporting-rates-exchange/treasury-reporting-rates-of-exchange (last visited May 21, 2025).

[7] The original contract (in Spanish) and an English translation of it were admitted into evidence. Besides Duarte-Hernandez's and his mother's signatures, the original contract bears the signatures of two witnesses: another brother of his and one of his aunts. The original contract also bears the signatures of two additional people with titles identified in the English translation as "Clerk of the Court" and "The Mixed Judge of Peace," plus an official seal reading "Poder Judicial Edo Lib Y Sob de Gro."

return in 2013 claiming as dependents two nieces and two nephews who live in Mexico, even though he was not actually supporting them, and that he "always tries to get more money out of wherever." He had also claimed the parties' children and Rodriguez as dependents on his tax returns, obtaining tax credits thereby, but he had never provided any of those credits to her.

She testified that Duarte-Hernandez had been physically abusive to her in the early years of the marriage, including being arrested for and charged with family violence in Illinois, but had not been physically abusive towards her in "a long time." He also had a "drinking problem" in the early years of the marriage. Although Rodriguez did not know whether he still had a drinking problem, after she had filed for divorce he came home drunk in his car one time with the parties' two minor children not wearing seatbelts. Rodriguez testified that her husband told her many times that he intends to return to Mexico after the divorce and stop paying child support. She said he had also once threatened to kill her and her father when he was drunk. She testified that her husband keeps roosters "for fights" on the Lucinda Drive Property and sells them each month. She does not know how many he sells, but she heard him tell a friend that he sells the roosters for $500 and the chicks for $120 to $140, and he keeps "too many" to count.

Rodriguez testified that she has a cosmetology license and a hairdressing business, mostly working out of her home or going to her clients' homes for special occasions such as quinceañeras. She works just a few hours per week or every other week, and she can continue working on such basis while taking care of the parties' disabled child because she either takes the child with her or asks Kevin to babysit. She explained that if the court awards her the Lucinda Drive Property, she plans to maintain the marital residence with the rent from the rental mobile homes on the property. Rodriguez explained that before and during the period

7

when Duarte-Hernandez alleged she had improperly withdrawn large sums from her bank account, Kevin had been depositing his paychecks into the account, and some of the other deposits had come from an insurance-company payout from a car accident Kevin had. Rodriguez testified that she did not understand that per the standing order she was prohibited from making withdrawals from any of the parties' accounts without her husband's or the court's approval. She said she used the money she withdrew to pay for tires on her car and on Kevin's car, to help Kevin fix his car after his accident, to fix the stairs leading into the residence, to go to the dentist, and to pay her attorney's fees and her living expenses, because she had not been working recently.

Rodriguez testified that she had heard Duarte-Hernandez and Marco's conversation about the County Line Property before its purchase and understood them to agree that they would buy it jointly. Despite Duarte-Hernandez's recent claims that the property belongs solely to Marco, "since there's cash [from Duarte-Hernandez's rooster sales], he could give cash to his brother" to pay for the property's mortgage and expenses, which she believed he had done.

Regarding the parties' disabled child, Rodriguez testified that since the February 18, 2022 genetic report and outpatient evaluation that were admitted into evidence—the evaluation assessed the child as having "good" rehabilitation potential—the child has improved "a little." The child is able to walk but still does not speak much—just a few words, and she cannot string them together, although she tries. The child has "balance deficits," cannot run or walk fast, and has a risk for falls. She does not have good dexterity and can grab a spoon but cannot feed herself because her food falls off the spoon due to poor coordination. The child cannot bathe herself or go up stairs except by crawling or with help. Rodriguez had to take the

8

child out of preschool because she was "always" getting sick—allergies, diarrhea, coughing and mucus—and has been at home with Rodriguez since September of the previous year. The child's teachers had reported to Rodriguez that the child was "very slow" and "needs a lot of help." Rodriguez tries to homeschool the child, but she has attention deficits and does not really pay attention to her. The child sees several specialists—a neurosurgeon, an ear/nose/throat specialist, an allergy specialist, a genetic specialist, and a kidney specialist—and it is too early to tell whether she will progress normally into adulthood or will have continuing problems. She cannot be left alone and needs someone looking after her at all times. For as long as the child has health issues, Rodriguez does not believe she will be able to maintain a steady job outside the house at a beauty shop unless she were able to keep the child with her at the workplace, but for as long as the child remains out of school, it will be hard for her to work more hours. Rodriguez has applied for social-security and medical benefits for the child but is waiting to hear a response.

Before Rodriguez filed for divorce, Duarte-Hernandez would not give her much money to provide for the household expenses, such as groceries, and often she would have to borrow money from her sister. When her sister sent money, Rodriguez would deposit it into her bank account. Rodriguez believes that Duarte-Hernandez gave his brother cash from his rooster sales to maintain the County Line Property and pay for taxes and other expenses. Duarte-Hernandez told her many times over the years that the Mexico house is community property and had just recently told her so again.

### Cates's testimony

Cates was the realtor who sold the Lucinda Drive Property to the parties and showed the County Line Property to Marco. She testified that she performed a comparative

9

market analysis for the Lucinda Drive Property in November 2022 and arrived at a value of $210,000, which includes the mobile homes on the property. She testified that the value had declined since then by about $6,000. Regarding the County Line Property, Cates testified that Duarte-Hernandez "didn't bring anything to the table" and simply "co-signed" the loan with his brother so that Marco could purchase it. Cates testified that the earnest money, option money, and down payments were made with cashier's checks drawn from Marco's bank account. Cates believed that the title company made a mistake in putting Duarte-Hernandez on the deed because the "lady that closed [t]his deal" quit ten days after closing and likely did not file "everything right." She testified that Marco and his sons have "done a lot of work on" the County Line Property, including adding a second mobile home, and that Duarte-Hernandez has "put nothing in that property."

### Kevin's testimony

Kevin testified that it is difficult caring for his disabled sister because it's hard to understand her speech and determine what she wants or what is bothering her, and she often will start "crying out of nowhere." He helps his mother whenever he can, both with childcare and with expenses, but he has a job of his own at a clothing store and tries to work as many hours as he can to help pay the household bills and to repay his mom for his car repairs. He testified that his parents had not gotten along very well for a while and that often his father would take out his anger on Rodriguez, and Kevin would have to "get in the middle and push [his] dad away." He explained that his mother had not received many hairdressing gigs in a while, but that when she does she usually only works one or two days every other weekend.

10

*Castaneda's testimony*

Castaneda testified that she and Marco purchased two mobile homes that sit on the County Line Property and that they rent out the homes. She explained that the utilities on the property are in Marco's name. She and Marco asked Duarte-Hernandez to co-sign the loan because they could not qualify without him. She said that neither Duarte-Hernandez nor Rodriguez ever went to the County Line Property to help maintain it, clear it, or make any improvements.

*Marco's testimony*

Marco testified that both he and Duarte-Hernandez are listed on the deed as owners of the County Line Property, which they purchased January 29, 2019. He said that he found the property with the help of Cates, and he is not entirely sure why his brother is on the deed because he had merely asked him for help with the loan through co-signing for it because Duarte-Hernandez already had good credit with the bank. He did not know to ask the title company to just put himself and his wife on the title, as he understood that until the loan was paid off, Duarte-Hernandez needed to be on the title as well. Marco testified that he made a $73,000 down payment on the property, plus closing costs, and that Duarte-Hernandez did not provide any of those funds. Marco testified that he pays the utilities and property taxes on the property. He testified that the remaining loan balance on the property is about $126,000. Marco explained that he has been the only one paying the mortgage since purchase. His plan once the divorce is finalized is to have Duarte-Hernandez deed the property over to him and "fix" the deed so that it is only in his name; he would have cleared up that mistake sooner but did not

realize the problem until the divorce was pending. The appraisal district has appraised the property at about $215,000. He purchased the property for around $247,000.

### *Duarte-Hernandez's testimony*

Duarte-Hernandez testified that he does not own any property in Mexico and that the deed to the disputed Mexico house is titled in his uncle's name. To support that claim he proffered, and the trial court admitted, a document in Spanish (and an English translation of it) dated April 1998 demonstrating that Duarte-Hernandez's grandmother granted "by donation" to her son, Duarte-Hernandez's uncle, "a fraction of" certain real property in the "El Pueblito" neighborhood of Cutzamala de Pinzon, identified by specified metes and bounds. Duarte-Hernandez denied spending any community funds to make improvements to the Mexico house, and he testified that his uncle has never transferred it to him. He believed that his uncles built the Mexico house for his grandmother, and Rodriguez's father has been living in the house for the past five or six years. He estimated the property owned by his uncle is worth about $20,000. He explained that it is in a high crime area, where "the cartel" is active, and it has a well for water but no septic system. When asked on cross-examination about the document purporting to demonstrate that Duarte-Hernandez had recently sold the Mexico house to his mother, he claimed it was a false document and that he had not sold the property to his mother because it was not his to sell because it belongs to his uncle.[8]

Duarte-Hernandez testified that the parties' disabled child is now able to safely walk up and down the stairs to get in and out of the residence because they made some

---

[8] The metes and bounds specified in the two real-property documents—the one proffered by Rodriguez and the one proffered by Duarte-Hernandez—are different and do not reference the same bordering streets or properties, and thus it is unclear whether the two documents pertain to the same tract of land, to portions thereof, or to two entirely different tracts of land.

12

modifications to make the stairs less slippery. He believes that Rodriguez can provide for her minimum reasonable needs post-divorce through her self-employment income as a hairdresser. He testified that she had made cash deposits into her bank account in 2020 of $18,666.81, in 2021 of $36,993.92, and in 2022 of $28,184.43, and he believed that the funds had come from her hairdressing business.

Duarte-Hernandez testified that he intends to sign over the deed to the County Line Property to his brother after the divorce is finalized, that he does not "really read English," and that he did not know his name was on the County Line Property title until the divorce proceedings began. He explained that his brother "asked for [his] help in the loan" and that the two of them "just signed" the paperwork with the bank, which "never explained" to them what everything meant. He testified that he used no community funds to purchase the County Line Property. The trial court admitted into evidence Duarte-Hernandez's proposed support decision and budgetary information. The information in the exhibit indicates that his gross monthly salary as a chef is $4,166.67 and the current monthly rental income from the two mobile homes, other than the marital residence, on the Lucinda Drive Property is $1,020.00.[9]

Duarte-Hernandez testified that he used to drink a lot but that he does not drink anymore and that "it's been more than ten years that [he doesn't] drink," although in response to a question about whether he occasionally drinks "for social reasons," he replied that he does "sometimes." He testified that the time when he was arrested in Illinois for domestic violence, Rodriguez had started the altercation when he was trying to sleep, and she hit and scratched him on his face.

---

[9] Duarte-Hernandez testified that he has been residing in the third mobile home.

DISCUSSION

In two issues, Duarte-Hernandez challenges the trial court's division of the marital property and award to Rodriguez of spousal support. Within his first issue are three sub-issues, in which he contends that (1) the evidence is factually insufficient to support the inclusion of the County Line Property in the marital estate because the property belongs to his brother, (2) the trial court abused its discretion in dividing the County Line Property without sufficient evidence of its value, and (3) there is no evidentiary support for the trial court's "extremely disproportionate" division of the community property.

We review a trial court's division of community property and award of spousal maintenance for an abuse of discretion. *See Murff v. Murff*, 615 S.W.2d 696, 698 (Tex. 1981) (property division); *Kelly v. Kelly*, 634 S.W.3d 335, 364 (Tex. App.—Houston [1st Dist.] 2021, no pet.) (spousal maintenance). It is an abuse of discretion for a trial court to rule arbitrarily, unreasonably, without regard for guiding rules or principles, or without supporting evidence. *Transcor Astra Grp. S.A. v. Petrobras Am. Inc.*, 650 S.W.3d 462, 482 (Tex. 2022).

Under an abuse-of-discretion standard, the "legal and factual sufficiency of the evidence are not independent grounds of error but instead are factors used to determine whether the trial court abused its discretion." *A.S. v. Texas Dep't of Fam. & Protective Servs.*, 665 S.W.3d 786, 795 (Tex. App.—Austin 2023, no pet.) (citing *Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied)). The reviewing court considers first whether the trial court had sufficient information on which to exercise its discretion and, if so, whether the trial court erred in its application of discretion. *Id.* (citing *Zeifman*, 212 S.W.3d at 588). "The traditional sufficiency review comes into play with regard to the first question." *T.E. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00067-CV, 2022 WL 3092885, at *8 (Tex. App.—

14

Austin Aug. 4, 2022, no pet.) (mem. op.) (citing *Zeifman*, 212 S.W.3d at 588). The court then determines whether, based on that evidence, the trial court's decision was reasonable. *A.S.*, 665 S.W.3d at 795.

In reviewing for legal sufficiency, "we view the evidence in the light most favorable to the verdict, crediting favorable evidence when reasonable jurors could do so and disregarding contrary evidence unless reasonable jurors could not." *Pike v. Texas EMC Mgmt.*, LLC, 610 S.W.3d 763, 794 (Tex. 2020). We will sustain a no-evidence challenge when (1) evidence of a vital fact is absent, (2) rules of law or evidence bar us from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *Bos v. Smith*, 556 S.W.3d 293, 299–300 (Tex. 2018).

In reviewing for factual sufficiency, "we examine the entire record and consider and weigh all the evidence, both in support of and contrary to the challenged finding." *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). To prevail in a factual-sufficiency challenge, a party who had the burden of proof at trial must demonstrate that the adverse finding is against the great weight and preponderance of evidence, and we will reverse only if, in light of the entire record, the evidence supporting the finding is so weak or the finding is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and unjust. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam).

Under either standard, the trier of fact "is the sole judge of the credibility of witnesses and the weight to be given their testimony." *Altice v. Hernandez*, 668 S.W.3d 399, 410 (Tex. App.—Houston [1st Dist.] 2022, no pet.) (citing *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003)). We therefore "may not pass upon the witnesses'

credibility or substitute our judgment for that of the fact finder." *4922 Holdings, LLC v. Rivera*, 625 S.W.3d 316, 325 (Tex. App.—Houston [14th Dist.] 2021, pet. denied).

Because neither party requested fact findings, and the trial court did not make any, we presume that the trial court made all necessary findings to support its division of property if there is any probative evidence to support the implied findings. *See Sheen v. Sheen*, No. 03-18-00358-CV, 2019 WL 2554570, at *4 (Tex. App.—Austin June 21, 2019, no pet.) (mem. op.); *Stoufflet v. Stoufflet*, No. 03-08-00003-CV, 2009 WL 722280, at *5 (Tex. App.—Austin Mar. 20, 2009, no pet.) (mem. op.).

### *Just and right division of marital estate*

When dividing the marital estate, the trial court is authorized to "order a division of the estate of the parties in a manner that the court deems just and right," Tex. Fam. Code § 7.001, and the trial court has "wide discretion" in that regard, *Murff*, 615 S.W.2d at 698. "Every reasonable presumption should be resolved in favor of the proper exercise of discretion by the trial court in dividing the property of the parties." *Zieba v. Martin*, 928 S.W.2d 782, 791 (Tex. App.—Houston [14th Dist.] 1996, no writ). "We presume on appeal that the trial court correctly exercised its discretion when dividing property in a divorce proceeding, and the appellant bears the burden to show from the record that the division was so disproportionate, and thus unfair, that it constitutes an abuse of discretion." *O'Carolan v. Hopper*, 414 S.W.3d 288, 311 (Tex. App.—Austin 2013, no pet.) (*O'Carolan II*); *see Murff*, 615 S.W.2d at 700 ("Wide latitude and discretion rests in these trial courts and that discretion should only be disturbed in the case of clear abuse."); *see also O'Carolan v. Hopper*, 71 S.W.3d 529, 532 (Tex. App.—

Austin 2002, no pet.) *(O'Carolan I)* ("To constitute an abuse of discretion, the property division must be manifestly unfair.").

A number of factors may be relevant to the determination of a "just and right" division. *Murff*, 615 S.W.2d at 699. A non-exclusive list includes such factors as the parties' disparity in income or earning capacity, the parties' capacities and abilities, the parties' relative needs and financial condition, the parties' relative fault in ending the marriage, the benefits the party without fault would have received had the marriage continued, as well as the parties' relative physical conditions, future business prospects, disparity in age, separate estates, education, the nature of the property to be divided, and any wasting of the community assets by one of the spouses. *Id.*; *Young v. Young*, 609 S.W.2d 758, 762 (Tex. 1980); *Alonso v. Alvarez*, 409 S.W.3d 754, 758 (Tex. App.—San Antonio 2013, pet. denied). The trial court has wide discretion in balancing these factors and determining the proper division. *Murff*, 615 S.W.2d at 698. Although the marital estate need not be divided equally, the division must be equitable. *Chafino v. Chafino*, 228 S.W.3d 467, 473 (Tex. App.—El Paso 2007, no pet.). If the trial court makes an unequal division, it must have a reasonable basis for doing so. *Id.*

By his first sub-issue, Duarte-Hernandez argues that the evidence is factually insufficient to support the trial court's implied finding that the County Line Property is community property because, he contends, it belongs solely to his brother. He cites the testimony of Cates, Marco, and himself as evidence that—despite his name "mistakenly" appearing on the deed—the property in fact belongs solely to Marco because that was the brothers' intent, neither Duarte-Hernandez nor Rodriguez made any contributions towards the property, and Duarte-Hernandez merely "co-signed" for the mortgage. However, contrary evidence admitted by the trial court on the issue included the following documents: (1) a

17

Warranty Deed with Vendor's Lien, dated January 29, 2019, by which the named prior owners ("Grantors") conveyed the County Line Property to Duarte-Hernandez and Marco as "Grantees" for cash and a $172,900 bank note; (2) a Deed of Trust executed by the two brothers (each identified as "a married man" and as the "debtor(s)" and "grantors") by which they conveyed the property (and the mobile home thereon) in trust to the First National Bank of Bastrop to secure their repayment of the $172,900 loan to the bank; and (3) a property insurance policy declaration on the County Line Property mobile home identifying Duarte-Hernandez as the named insured. Notably, on the Deed of Trust Duarte-Hernandez's signature appears immediately next to Marco's and is not accompanied by any notation that he is merely a co-signer.

In light of these documents demonstrating that Duarte-Hernandez and Marco are co-owners of the contested property, we cannot say that the evidence is factually insufficient to support the trial court's implied finding that the community owned an undivided 50% interest in the County Line Property. *See* Tex. Fam. Code §§ 3.002 (defining community property as property, other than separate property, acquired by either spouse during marriage), .003(a) (providing that property possessed by either spouse during or on dissolution of marriage is presumed to be community property). Given the entire record, the testimony Duarte-Hernandez cites does not demonstrate that the trial court's finding is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and unjust, *see Dow Chem. Co.*, 46 S.W.3d at 241; *Ganesan v. Vallabhaneni*, 96 S.W.3d 345, 354 (Tex. App.—Austin 2002, pet. denied), especially considering the trial court's role as factfinder to judge the credibility of witnesses and the weight to be given to their testimony and to different forms of evidence, *see City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). We overrule Duarte-Hernandez's first sub-issue.

In his second sub-issue, Duarte-Hernandez contends that, if the community had an undivided 50% interest in the County Line Property, the trial court could not have properly divided that asset because it did not have sufficient evidence of its value. He cites undisputed testimony demonstrating that Marco has made all the payments towards the property, including the down payment, earnest money, mortgage payments, utilities, and taxes, since its purchase. Duarte-Hernandez argues that Marco has a "potential equitable claim" against him for the payments Marco has made on the property, and that because Marco is not a party to this suit, "any determination in this case [as to the community's interest in the County Line Property] will not work as res judicata to any future litigation regarding" that property. *See* Tex. Prop. Code § 23.001 (providing that joint owner of real property or of interest therein "may compel a partition" of such property or interest); *Johnson v. Johnson-McHenry*, 978 S.W.2d 142, 144 (Tex. App.—Austin 1998, no pet.) ("Generally in a partition suit, the trial court determines whether the partition will be by sale or in kind, the share or interest of the joint owners or claimants, and all questions of law or equity affecting title" and "then allocates to the parties their rightful shares or tracts."); *Williams v. Shamburger*, 638 S.W.2d 639, 640 (Tex. App.—Waco 1982, writ ref'd n.r.e.) (observing that co-owners of property are obligated to share income with other owners and are entitled to recover reasonable and necessary expenditures for preservation of property).

However, while Duarte-Hernandez produced evidence of expenditures that Marco allegedly made towards the property, he did not provide evidence of the rental proceeds that Marco has received from the two mobile homes thereon over the four years between its purchase and trial. As Duarte-Hernandez concedes in his brief, those rental proceeds would "offset" the payments Marco has allegedly made and thus reduce the amount of any equitable claim Marco

might have. Despite Marco testifying at trial, the amounts of such rental proceeds are not in the record. Generally, a party who does not provide the trial court with values for particular property in a divorce proceeding cannot complain on appeal of the trial court's lack of information in dividing that asset. *See Delgado v. Delgado*, 587 S.W.3d 450, 455–56 (Tex. App.—El Paso 2019, no pet.); *Howe v. Howe*, 551 S.W.3d 236, 254 (Tex. App.—El Paso 2018, no pet.); *Capellen v. Capellen*, 888 S.W.2d 539, 543 (Tex. App.—El Paso 1994, writ denied) (rejecting husband's claim of insufficient evidence to value certain property where husband testified but did not offer proof of value). Duarte-Hernandez did not produce evidence of the County Line Property rental proceeds, which would be relevant to the value of any equitable claim Marco might have, and thus Duarte-Hernandez cannot now complain that the trial court had insufficient evidence of the value of such claim and thus of the community's share of the County Line Property. We accordingly overrule Duarte-Hernandez's second sub-issue.

In his third sub-issue, Duarte-Hernandez argues that the trial court abused its discretion by making an "extremely disproportionate" division of property by awarding Rodriguez at least 86% of the community property.[10] However, because the trial court made no express fact findings, we cannot discern the percentage split actually made by the trial court or what value, if any, it assigned to any of the assets, including the County Line Property and the Mexico home. Furthermore, there was no evidence presented of the value of some of the assets the court divided—e.g., personal and household effects, Duarte-Hernandez's chicks and roosters,

---

[10] The 86% figure derives from a chart in Duarte-Hernandez's brief wherein he lists values for the various assets and evidence in the record purportedly supporting such values, but some of that evidence was disputed or, in the case of the County Line Property and as already discussed, incomplete. He also lists a value of $18,900 for Rodriguez's hairdressing business, but the record citation he provides as support does not supply such number but is rather her testimony that she had spent an unquantified amount of money on makeup and creams for her business.

and Rodriguez's hairdressing business. It is therefore impossible to determine from the record the actual percentage each party received.

Given the trial court's province as the factfinder and the absence of fact findings, we also must infer all findings supported by the evidence that would favor a disproportionate division in Rodriguez's favor, including alleged waste and fraud. A trial court is entitled to take such wrongful conduct into consideration when dividing the community estate. *See Boothe v. Boothe*, 681 S.W.3d 916, 925–26 (Tex. App.—Houston [14th Dist.] 2023, no pet.); *Dailey v. Dailey*, No. 02-12-00097-CV, 2013 WL 105667, at *5 (Tex. App.—Fort Worth Jan. 10, 2013, no pet.) (mem. op.) (noting that presumption of constructive fraud arises when one spouses disposes of community property without other spouse's knowledge or consent, upholding implied finding of waste by husband in absence of fact findings, and affirming disproportionate award to wife). Both parties asserted waste and fraud-on-the-community claims and presented evidence in support thereof. Because there are no fact findings, however, we do not know what impact the parties' competing claims of wrongful disposition or depletion of community assets had on the trial court's property division, although the supreme court has recognized that evidence of such conduct may support a disproportionate disposition. *See Schlueter v. Schlueter*, 975 S.W.2d 584, 589 (Tex. 1998); *Dailey*, 2013 WL 105667, at *5 ("Among a myriad of factors the trial court may consider when making a just and right division, two are (1) a spouse's dissipation of the community estate and (2) any misuse of community property."); *see also Miller v. Miller*, No. 14-17-00293-CV, 2018 WL 3151241, at *5 (Tex. App.—Houston [14th Dist.] June 28, 2018, no pet.) (mem. op.) (noting that fraud-on-the-community claim is "not an independent tort but a means of redress for a deprivation of community assets to be considered as part of a just and right division of the community estate").

The record contains evidence that Duarte-Hernandez stopped making payments on two prior marital homes, causing the homes to be foreclosed upon, and then used those funds to purchase the Mexico home, on which home he spent additional community funds to improve and expand by adding a second floor. Rodriguez testified that Duarte-Hernandez did not inform her how much he spent on the Mexico home or its improvements and did not tell her about or share with her the tax refunds he received or the proceeds from his rooster and chick sales. There was evidence that Duarte-Hernandez sold the parties' Mexico home to his mother while the divorce was pending for about $800, with no accounting of such proceeds. Although Duarte-Hernandez presented evidence purporting to show fraud on the community committed by Rodriguez and that the disputed Mexico property had never belonged to him or the community, the trial court was the sole judge of the credibility of this and other evidence and of the weight to be given to the evidence. Given that in the absence of express fact findings, we must infer all fact findings in favor of the trial court's division that are supported by probative evidence, *see Sheen*, 2019 WL 2554570, at *4, we conclude that Duarte-Hernandez failed to carry his burden to demonstrate that the division of property was manifestly unjust, and we overrule his first issue, *see O'Carolan II*, 414 S.W.3d at 311.

### Spousal support

In his second issue, Duarte-Hernandez contends that the trial court abused its discretion in awarding Rodriguez $500 per month in spousal support because there is legally insufficient evidence (a) of Rodriguez's minimum reasonable needs and (b) that she is prevented from working because she is the custodian of the parties' disabled child. *See* Tex. Fam. Code § 8.051. Rodriguez bore the burden of proof on her spousal-maintenance claim. *See Debrock v.*

22

*Debrock*, No. 03-21-00308-CV, 2022 WL 17970214, at *2 (Tex. App.—Austin Dec. 28, 2022, pet. denied) (mem. op.).

Spousal maintenance is an "award . . . of periodic payments from the future income of one spouse for the support of the other spouse." Tex. Fam. Code § 8.001(1). The purpose of spousal maintenance is to provide temporary and rehabilitative support for a spouse whose ability to support himself or herself has eroded over time while engaged in homemaking activities and whose capital assets are insufficient to provide support. *O'Carolan I*, 71 S.W.3d at 533. A trial court may award spousal maintenance only if the party seeking maintenance meets the statutory eligibility requirements under Section 8.051 of the Family Code. *See* Tex. Fam. Code § 8.051.

The Family Code does not define "minimum reasonable needs," and therefore determining what those needs are for a particular individual is a fact-specific determination which must be made by the trial court on a case-by-case basis. *Debrock*, 2022 WL 17970214, at *7. Although a list of monthly expenses is "helpful," it is not the only evidence upon which the trial court can determine a person's minimum reasonable needs. *See Diaz v. Diaz*, 350 S.W.3d 251, 254 (Tex. App.—San Antonio 2011, pet. denied). Nonetheless, there must be some evidence in the record from which the trial court may determine what the spouse's minimum reasonable needs are. *See In re B.P.*, No. 05-22-00040-CV, 2023 WL 3735237, at *2 (Tex. App.—Dallas May 31, 2023, no pet.) (mem. op.) (determining that general testimony that wife had monthly expenses of $11,000 was legally insufficient to demonstrate what her minimum reasonable needs were); *Howe v. Howe*, 551 S.W.3d 236, 257 (Tex. App.—El Paso 2018, no pet.) (reversing award of spousal support where record lacked any development of party's minimum reasonable needs); *Petra v. Petra*, No. 04-09-00214-CV, 2010 WL 374388,

at *2 (Tex. App.—San Antonio Feb. 3, 2010, no pet.) (mem. op.) (determining that evidence of minimum reasonable needs was legally insufficient when it consisted solely of wife's testimony that she couldn't "meet her bills" unless she received $700 in spousal maintenance).

Although Rodriguez proffered as evidence no itemized list of fixed or variable monthly expenses and did not specifically testify about them, she did testify about some recent expenses she had paid with the funds she had withdrawn from community accounts while the cause was pending: Kevin's car repairs ($2,000), new tires for her car ($700), her dentist visit (no amount provided), and her attorney's fees ($6,500). Additionally, there was evidence about the monthly expenses for property taxes, repairs, maintenance, and utilities for the marital home that Rodriguez was awarded, and Rodriguez testified that Duarte-Hernandez had been paying such expenses while the cause was pending. According to Duarte-Hernandez's budget, which the trial court admitted, those expenses are $1,458 per month.[11] Such evidence shows that Rodriguez could expect to pay at least that amount each month going forward merely to maintain the Lucinda Drive Property. Although there was no evidence quantifying Rodriguez's other regular monthly expenses, the record supports the implied finding that she incurs some amount of expenses for additional items such as groceries (for which she had had to borrow money from her sister), medical and dental care for herself and her disabled child, car maintenance and repairs, and a cell phone. Thus, there was evidence that Rodriguez had monthly minimum reasonable needs of at least $1,458. We overrule Duarte-Hernandez's challenge that there was legally insufficient evidence of Rodriguez's minimum reasonable needs.

---

[11] The following individual home expenses comprise that total: $660 for property taxes, $350 for repairs and maintenance, and $448 for utilities. While the $660 appears to reflect the past-due property-tax payments that Duarte-Hernandez was making for the 2022 tax year, it is reasonable to conclude that Rodriguez would continue incurring at least similar amounts in ongoing property-tax liability.

Regarding whether Rodriguez proved that she was prevented from working more hours and bringing in more income from her hairdressing business due to her being the custodian of the parties' disabled child, we conclude that there was legally sufficient evidence supporting such implied finding by the trial court. *See* Tex. Fam. Code § 8.051(2)(C) (authorizing spousal maintenance if, relevantly, spouse is custodian of child "of the marriage . . . who requires substantial care and personal supervision because of a physical or mental disability that prevents the spouse from earning sufficient income to provide for the spouse's minimum reasonable needs"). Rodriguez testified about the extent of the disability of the parties' youngest child and about how Rodriguez had to take the child out of preschool because she was getting sick too often. She explained the physical and mental difficulties the child has, including walking, speaking, bathing, and eating, and that she needs constant supervision. Although Kevin is able to babysit for the few hours each month that Rodriguez has hairdressing gigs, Kevin has his own job, and Rodriguez does not believe she can hold down a job outside the home at a beauty shop for as long as the youngest child remains out of school and needs care.

Rodriguez testified that if she were awarded the Lucinda Drive Property, she would maintain the family residence thereon with the rent from the three other mobile homes on the property. Duarte-Hernandez's budget admitted into evidence indicated that the monthly rental income from two of the three other mobile homes on the Lucinda Drive Property was $1,020, although when testifying he explained that he was currently receiving only $800 for one of the two units—which needs repairs, including for its cracked ceiling and bathroom sheetrock and rotten siding—and was no longer collecting rent from the second unit because the tenants

25

were "fixing the inside of the house" because it was "really in bad shape."[12] He did not indicate how long the repairs would take, but pictures of the units were admitted into evidence, and Duarte-Hernandez testified that parts of the floor in the second unit still need to be replaced. He explained that the units were "really old" and that once or twice per month some kind of repair is required. The amount of Rodriguez's income from her hairdressing business was disputed: Duarte-Hernandez testified that she had averaged $27,948 per year in the three years before trial, indicated by cash deposits she made into her bank account, but the sources of those deposits are not in the record; Rodriguez testified that she has been working much less lately since the parties' disabled child stopped attending preschool and that she now makes between $150 and $200 per gig, about twice a month.

Adding Rodriguez's current monthly hairdressing income of about $300–$400 and the rental income of $800–$1,020 results in $1,100–$1,420 per month, which is less than the $1,458 per month Rodriguez requires merely to maintain the family home—not accounting for basic necessities such as food and medical care. The trial court was free to judge the credibility of the witnesses and weigh the evidence in the exercise of its broad discretion, and we must conclude—in the absence of express fact findings—that the trial court made all findings in support of its award of $500 per month to Rodriguez as spousal support. *See Sheen*, 2019 WL 2554570, at *4. Having reviewed the record including the summarized portions of it above, we conclude that the evidence is legally sufficient to support the trial court's award of spousal

---

[12] Rodriguez may be able to rent out the third mobile home (in which Duarte-Rodriguez was residing at the time of trial) going forward, but the record does not include the anticipated rental revenue from that unit, and the testimony and pictures of the unit (a one-bedroom RV) indicate that it too is in need of repairs.

26

support and that it did not abuse its discretion in making the award, and we overrule Duarte-Rodriguez's second issue.

## CONCLUSION

Having overruled Duarte-Hernandez's issues, we affirm the trial court's final divorce decree.

_____

Karin Crump, Justice

Before Justices Theofanis, Crump, and Ellis

Affirmed

Filed: May 23, 2025